**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **OCCUPY NASHVILLE** et al. , | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION NO. 3:11-CV-01037 |
| | ) | JUDGE TRAUGER |
| v. | ) | |
| | ) | |
| WILLIAM EDWARD "BILL" **HASLAM**, et al., | ) | |
| | ) | |
| Defendants. | ) | **JURY DEMAND** |
| | ) | |

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### I.   INTRODUCTION

These fundamental principles of American society urge this Court to reject the

Defendants' Motion for Summary Judgment:

> The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections. *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638, 63 S. Ct. 1178, 1185-86, 87 L. Ed. 1628 (1943).

> [A] principal "function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger.'" *Texas v. Johnson*, 491 U.S. 397, 408-09, 109 S. Ct. 2533, 2542, 105 L. Ed. 2d 342 (1989).

> The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails. The Supreme Court has repeatedly recognized that "[w]hen government officials abuse their offices, 'action[s] for damages may offer the only realistic avenue for vindication of constitutional guarantees.' " *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) (citations omitted).

Case 3:11-cv-01037   Document 79   Filed 04/11/13   Page 1 of 32 PageID #: 1587

Even superficial scrutiny of the Defendants' conduct leads to the conclusion that they willfully violated the Constitutional rights of the Plaintiffs. Presumably, because their conduct was so patently illegal, the Defendants have constructed their Motion with a mischaracterization of legal precedent layered on top of a series of factual misstatements. Neither misstatements nor mischaracterizations should deter the Court from the necessary result – denial of this Motion for Summary Judgment.

## II.     STATEMENT OF FACTS

Because of the legally indefensible nature of the Defendants' conduct, which they once seemingly admitted, they are now required to twist and ignore the facts to support their Motion. The most pertinent of these instances are:

*False Allegation 1.*     The New Rules prohibited camping on Legislative Plaza.

*True Fact 1.*     The New Rules prohibited any physical presence on Legislative Plaza after 10:00 p.m. (Plaintiffs' Additional Fact ("AF") 46).

*False Allegation 2.*     The Plaintiffs were arrested for camping.

*True Fact 2.*     The Plaintiffs were arrested for being present on Legislative Plaza after 10:00 p.m. – none were in a tent at the time of their arrest. (AF 49-52).

*False Allegation 3.*     The Defendants relied on the advice of counsel in adopting the new Rules.

*True Fact 3.*     The Defendants directed their attorney to draft rules which impose a curfew without asking if that result was permissible. (AF 22-23)

*False Allegation 4.*     The Defendants acted within their authority when they imposed the curfew.

*True Fact 4.*     The Defendants ignored that State law (UAPA) required consultation with the Attorney General and publication of the New Rules before they could become effective. (AF 25-26).

Other undisputed and disputed facts are outlined in the Plaintiffs' Response to Defendants' Concise Statement of Undisputed Facts and Additional Facts in Dispute filed contemporaneously with this Motion. The vast majority of the facts are not in dispute. The central dispute is over what the New Rules state – and they speak for themselves.

## III.    ARGUMENT

### A.    Defendants' Flagrant Violation of the UAPA Precludes Qualified Immunity.

"[A]n official who performs an act clearly established to be beyond the scope of his discretionary authority is not entitled to claim qualified immunity under § 1983." *In re Allen*, 106 F.3d 582, 593 (4th Cir. 1997).

Inherent in our form of government is a segregation of powers between the three branches of government which limits the ability of each branch to take action. Not only does this segregation relate to the substance but also to the form. Specific to this matter, the State legislature is authorized to enact laws governing the conduct of the citizens of Tennessee. Likewise, the executive branch is both authorized and directed to enforce the laws adopted by the legislature. Because laws of general application, inherently, fail to address all possible circumstances, the Legislature has authorized the executive branch to adopt regulations implementing laws of general applicability.

Here, the Tennessee Department of General Services is authorized and obligated to make rules for the use of the Plaza. Tenn. Code Ann. **§§** 4-3-1105, 4-4-103; 4-8-101, 103 & 104**,** 4-3-1103 &1105 and 4-3-2206. Prior to Occupy Nashville's protest commencing at Legislative Plaza, the Department of General Services had adopted a set of limitations on the Plaza's use (the "Old Rules")(AF 4). It is unknown when or how these Old Rules were adopted; however, it is clear that they placed no limitation on the hours of use and had been interpreted by the State to allow non-exclusive use of the Plaza without seeking a permit. (AF 4).

On October 27, 2011, the Old Rules were amended by fiat in secret, without notice, comment, approval by the Attorney General and Reporter or publication by the Secretary of State. (AF40-46 and 28-30). These New Rules, which purport to be of immediate applicability, were posted on the Plaza in the afternoon of October 27, 2011. (AF 46). The New Rules were then enforced on October 28, 2011. (AF 47-52). No emergency requiring the promulgation of new rules existed. These New Rules unconstitutionally limit access by the public to a forum universally accepted to be an area protected for the speech of the governed.

Although the Tennessee Department of General Services characterized these rules (both Old and New) as policies, they, in fact, constitute rules under the UAPA. A "policy" means a set of decisions, procedures and practices pertaining to the _internal_ operation or actions of an agency. Tenn. Code Ann. § 4-5-102(12)(emphasis added). "Rule" means each agency statement of general applicability that implements or prescribes law or policy or describes the procedures or practice requirements of any agency. "Rule" includes the amendment or repeal of a prior rule. Tenn. Code Ann. § 4-5-102(12).

Tennessee requires that agencies issuing rules do so after notice and a hearing:

(a) An agency shall precede all its rulemaking with notice and a public hearing unless:
(1) The rule is adopted as an emergency rule; or

(2) The proposed rule is posted to the administrative register web site within the secretary of state's web site within five (5) business days of receipt, together with a statement that the agency will adopt the proposed rule without a public hearing unless within sixty (60) days after the first day of the month subsequent to the filing of the proposed rule with the secretary of state a petition for a public hearing on the proposed rule is filed by twenty-five (25) persons who will be affected by the rule, an association of twenty-five (25) or more members, a municipality or by a majority vote of any standing committee of the general assembly. If an agency receives such a petition, it shall not proceed with the proposed rulemaking until it has given notice and held a hearing as provided in this section. The agency shall forward the petition to the secretary of state. The

secretary of state shall not be required to compile all filings of the preceding month into one (1) document.

(b) Subdivision (a)(2) does not apply if another statute specifically requires the agency to hold a hearing prior to adoption of the rule under consideration.

(c) The secretary of state shall prescribe rules governing the manner and form in which proposed rules shall be prepared by the agencies for submission for publication under subdivision (a)(2). The secretary of state may refuse to accept for publication any proposed rule that does not conform to such requirements.
Tenn. Code Ann. § 4-5-202 (West)

The Department of General Services did not comply with the notice and hearing or any other requirement of the UAPA in issuing the New Rules. Instead, they simply issued them by fiat. State policies that are not promulgated in compliance with the UAPA are void. See Tenn. Code Ann. § 4-5-216.

By ignoring the UAPA, the Defendants exceeded the authority delegated to them by the Legislature. This violation is not without consequence to the people of the State. The transparency, review and comment embedded in the UAPA were absent and an unconstitutional, reckless rule was adopted. The Defendants should not be free to exceed the clear limits of their delegated authority and then seek the protection of this Court by an assertion of qualified immunity. On this basis alone, qualified immunity should be rejected.

**B.    The Defendants' Alleged Reliance on Advice of Counsel Does Not Mean They Acted in Good Faith.**

Initially, it is hotly disputed whether the Defendants relied on the advice of counsel or simply directed its counsel to draft a policy – without asking about the legal limits on their ability to impose a curfew. No evidence exists of such a request. The Defendants' attorney testified that the decision to impose a curfew was made in the context of an allocation of financial resources and that he was directed to draft the policy. (AF 22-23). He then did some research on Google. (AF 32-33). Further, the Defendants were legally obligated to consult with

the Attorney General and refused to do so. (AF 35).   This fact alone undermines the proposition

that the Defendants actually relied on advice of counsel.

The undersigned could not locate a case where the Sixth Circuit has ever held that

reliance on advice of counsel established good faith or created qualified immunity.   It <u>has</u>

outlined the appropriate standard:

> [While] there are circumstances in which reliance on the advice of counsel may
> support a claim of qualified immunity. These circumstances must be
> "extraordinary."  In *Harlow*, 457 U.S. at 818-19, the Supreme Court created an
> "extraordinary circumstances" exception that entitles a defendant to qualified
> immunity even where he or she is otherwise not entitled to it. The Court wrote:
>
>> If the law was clearly established, the [qualified] immunity defense
>> ordinarily should fail, since a reasonably competent public official should
>> know the law governing his conduct. Nevertheless, if the official pleading
>> the defense claims extraordinary circumstances and can prove that he
>> neither knew nor should have known of the relevant legal standard, the
>> defense should be sustained. But again, the defense would turn primarily
>> on objective factors.
>
> A defendant government official will often claim that reliance on legal advice
> constitutes an "extraordinary circumstance" under *Harlow*. *See V-1,* 902 F.2d at
> 1488. Where that claim is made, the "defendant bears the burden of proving such
> circumstances." *Id.*
>
> The "extraordinary circumstances" exception applies only rarely. The Tenth
> Circuit has stated that:
>
>> The circumstance most often considered for treatment as "extraordinary"
>> is reliance upon the advice of counsel. Of course, such reliance is not
>> inherently extraordinary, for few things in government are more common
>> than the receipt of legal advice. Still, reliance on the advice of counsel in
>> certain circumstances rises to the level of extraordinary circumstances.
>
> *Id.* And the Fourth Circuit has written that "although reliance on counsel's advice
> may indeed be a factor to be considered in deciding whether a defendant has
> demonstrated an 'extraordinary circumstance,' reliance on legal advice *alone* does
> not, in and of itself, constitute an 'extraordinary circumstance' sufficient to prove
> entitlement to the exception to the general *Harlow* rule." *York v. Purkey,* 14 F.
> App'x 628, 633 (6th Cir. 2001)(citations omitted)

Here, the Defendants have not presented any extraordinary circumstances.  The Occupy protests had been going on for days, the alleged issues of cleanliness and violence could have been addressed by the allocation of resources but the Defendants refused to make that allocation. (AF 17-19 and 43-44).  The only thing extraordinary was the increasing level of complaints from elected officials.  (AF 20-21).  These circumstances are not extraordinary.  The *legal advice, if any,* offered here is nothing more than the common receipt of legal advice which the courts have uniformly rejected as a basis for qualified immunity.

### C.   Clearly Established Law Prohibited the Defendants from Imposing the New Rules and Precludes Qualified Immunity.[1]

Even if the Defendants had not acted outside its delegated authority, qualified immunity is not warranted under these circumstances.

#### 1.   Legal Standard for "Cleary Established Law" and Burden of Proof

"Generally, the qualified immunity inquiry involves first determining whether a constitutional violation occurred, and, if so, a subsequent determination of whether the right infringed was clearly established." *Saucier v. Katz,* 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *McKinley v. City of Mansfield,* 404 F.3d 418, 429–30 (6th Cir.2005).  For a right to be "clearly established," it need not be specifically announced by the Supreme Court or the Sixth Circuit. As the Sixth Circuit has explained:

> "For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Leonard v. Robinson,* 477 F.3d 347, 355 (6th Cir.2007) (citation and internal quotation marks omitted). "A right is clearly established if there is binding precedent from the Supreme Court, the Sixth Circuit, the district court itself, or other circuits that is directly on point." *Risbridger v. Connelly,* 275 F.3d 565, 569 (6th Cir.2002) (citation omitted). However, "[t]his is not to say that an official action is protected by qualified immunity unless the very action in

---

[1] Much of the argument regarding the Constitution's limitations on the Defendants' ability to regulate use of Legislative Plaza has been previously briefed by the Plaintiffs.  Much of what is included in Section II, C comes from previous briefs but is equally applicable here.

question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent." *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999).... A public official could "still be on notice that [his] conduct violates established law even in novel factual circumstances." *Hope v. Pelzer,* 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). *Holzemer v. City of Memphis,* 621 F.3d 512, 527 (6th Cir.2010).

When a defendant raises qualified immunity as a defense, the plaintiff bears the burden of demonstrating that the defendant is not entitled to qualified immunity. *Baker v. City of Hamilton,* 471 F.3d 601, 605 (6th Cir.2006). The plaintiff has the burden of showing that a right is clearly established. *Barrett v. Steubenville City Sch.,* 388 F.3d 967, 970 (6th Cir.2004). However, the defendant carries the burden of showing that the challenged act was objectively reasonable in light of the law existing at the time. *Tucker v. City of Richmond,* 388 F.3d 216, 220 (6th Cir.2004).

> ## 2. *It Is Irrelevant Whether a Ban on Camping Was Clearly Established Because the New Rules Did Not Simply Ban Camping Nor Were the Plaintiffs Arrested for Camping.*

Initially, the Defendants ask this Court to give them qualified immunity based on the argument that it was not clearly established that the State could not prohibit camping. This argument might require some thought if the State had either prohibited camping or the Plaintiffs had been arrested for camping. Neither is true – the State imposed a curfew on all activity including mere presence and then arrested the Plaintiffs for violating the curfew even though none of them were camping at the time of their arrest.

> ## 3. *It Is Well Established that the Curfew Imposed on Legislative Plaza Violates the United States Constitution.*

The Supreme Court has held that a restriction on protected speech is "sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no

greater than is essential to the furtherance of that interest." *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L. Ed.2d 672 (1968). Similarly, "time, place, and manner" regulations of protected speech will survive constitutional scrutiny only "so long as they are [content neutral,] designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication." *City of Renton v. Playtime Theatres,* 475 U.S. 41, 47, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986).

In this case, the only interest which the State has asserted is its interest in protecting the Plaza from damage and to protect the protesters from violence. (Defendants Concise Statement of Undisputed Facts 128.). Prior to imposing New Rules, the State took no steps to investigate whether there were other measures which would have been equally effective in achieving these interests. For example, the State did not investigate: 1) imposing a ban on the use of tent stakes; 2) providing restroom facilities; 3) asking Metro Police to assist with security during the night; or 4) imposing limits on the use of devices requiring power. (AF 9-19). Instead, once the State determined that the Plaza was at risk at night, they elected the most absolute regulation. They simply closed the Plaza – one of the State's preeminent public *fora.* Limiting the times available for First Amendment activity at the Plaza to 9 a.m. to 4 p.m. is neither a reasonable restriction for is it sufficiently narrowly tailored.

The First Amendment, subject only to narrow and well-understood exceptions, does not countenance governmental control over the content of messages expressed by private individuals. *R.A.V. v. St. Paul,* 505 U.S. 377, 382-383, 112 S.Ct. 2538, 2542-2543, 120 L.Ed.2d 305 (1992); *Texas v. Johnson,* 491 U.S. 397, 414, 109 S.Ct. 2533, 2545, 105 L.Ed.2d 342 (1989). Supreme Court precedent applies the most exacting scrutiny to regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content. See *Simon &*

*Schuster,* 502 U.S., at 115, 112 S.Ct., at 507-08; *id.,* at 125-126, 112 S.Ct., at 513 (KENNEDY, J., concurring in judgment); *Perry Ed. Assn. v. Perry Local Educators' Assn.,* 460 U.S. 37, 45, 103 S.Ct. 948, 954-955, 74 L.Ed.2d 794 (1983). Laws that compel speakers to utter or distribute speech bearing a particular message are subject to the same rigorous scrutiny. See *Riley v. National Federation for Blind of N.C., Inc.,* 487 U.S., at 798, 108 S.Ct., at 2678; *West Virginia Bd. of Ed. v. Barnette, supra.* In contrast, regulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny, see *Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3068-3069, 82 L.Ed.2d 221 (1984), because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue.

Deciding whether a particular regulation is content based or content neutral is not always a simple task. The Supreme Court has said that the "principal inquiry in determining content neutrality ... is whether the government has adopted a regulation of speech because of [agreement or] disagreement with the message it conveys." *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 2754, 105 L.Ed.2d 661 (1989). See *R.A.V., supra,* 505 U.S., at 386, 112 S.Ct., at 2545 ("The government may not regulate [speech] based on hostility-or favoritism-towards the underlying message expressed"). The purpose, or justification, of a regulation will often be evident on its face. See *Frisby v. Schultz,* 487 U.S. 474, 481, 108 S.Ct. 2495, 2500-2501, 101 L.Ed.2d 420 (1988).  But while a content-based purpose may be sufficient in certain circumstances to show that a regulation is content based, it is not necessary to such a showing in all cases. Cf. *Simon & Schuster, supra,* 502 U.S., at 117, 112 S.Ct., at 509 (" '[I]llicit legislative intent is not the *sine qua non* of a violation of the First Amendment' ") (quoting *Minneapolis Star & Tribune, supra,* 460 U.S., at 592, 103 S.Ct., at 1375-1376). Nor will the

mere assertion of a content-neutral purpose be enough to save a law which, on its face, discriminates based on content. *Arkansas Writers' Project,* 481 U.S., at 231-232, 107 S.Ct., at 1728-1729; *Carey v. Brown,* 447 U.S. 455, 464-469, 100 S.Ct. 2286, 2292-2295, 65 L.Ed.2d 263 (1980).

Here, the Defendants have admitted that the New Rules were adopted to address what they believe were the consequences the Occupy Nashville protesters – damage to the Plaza and lack of security. These same problems existed before the Occupy Nashville protests yet the State had elected not to impose a curfew Further, Commissioner Cates made the decision to impose the curfew <u>because</u> Occupy Nashville indicated that they lacked resources to hire additional security. (AF 9-19). Thus, by implication, if the Occupy Nashville protesters had been well healed enough to afford security and sanitary facilities, no curfew would have been necessary. Finally, Thad Watkins testified that the New Rules were temporary and would expire as soon as the Occupy Nashville protests ended. (AF 38-39). Imposing a curfew in this manner amounts to imposing a curfew on Occupy Nashville specifically and those who advocate for the poor more generally. Such content based regulation is impermissible.

4. *It Is Well Established that The New Rules Are Impermissible Restrictions on the Plaintiffs' Speech Because They Give Arbitrary Decision Making Authority to One Person and Give No Written Standards for Decision-making.*

Consistent with strict scrutiny analysis, any government functions that enact a prior restraint on speech "come to court bearing a heavy presumption against their validity." *Nightclubs, Inc. v. City of Paducah*, 202 F.3d 884, 889 (6th Cir. 2000) (*citing Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558 (1975)). This presumption flows from the risk of two particular "'evils that will not be tolerated:' (1) the risk of censorship associated with the vesting of unbridled discretion in government officials; and (2) 'the risk of indefinitely

suppressing permissible speech' when a licensing law fails to provide for the prompt issuance of a license." *Nightclubs*, 202 F.3d at 889 (*citing FW/PBS v. City of Dallas*, 493 U.S. 215, 225-7 (1990)).

To protect against the occurrence of these impermissible risks, ordinances which regulate protected speech and expression by requiring a permit or other form of governmental permission must limit the amount of discretion vested in state officials. *See, e.g., Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 151 (1969*).* An ordinance that gives public officials the power to decide whether to permit expressive activity in this manner must contain precise and objective criteria on which they must make their decisions; an ordinance that gives too much discretion to public officials is invalid. *See City of Jacksonville v. Lady J. Lingerie, Inc*., 529 U.S. 1053 (2000). To ensure that prior restraints do not infringe upon First Amendment rights, courts have required that a permitting scheme leave relatively little discretion in the hands of public officials regarding whether or not to grant a permit. *See, e.g., Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123 (1992). In other words, "an ordinance . . . which makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official–as by requiring a permit or license which may be granted or withheld in the discretion of the official–is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms." *FW/PBS,* 493 U.S. at 226 (quoting *Staub v. City of Baxley*, 355 U.S. 313, 322 (1958)).

When a regulatory scheme limits speech in a traditional public forum, as the New Rules undoubtedly do, it is even more imperative that the constitutionally protected expressive activity at issue be protected from governmental censorship. As the Supreme Court has stated, "'a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license' must

contain 'narrow, objective, and definite standards to guide the licensing authority.' . . . The reasoning is simple: If the permit scheme 'involves appraisal of facts, the exercise of judgment, and the formation of an opinion,'. . . by the licensing authority, 'the danger of censorship and of abridgment of our precious First Amendment freedoms is too great' to be permitted." *Forsyth County*, 505 U.S. at 131 (internal citations omitted). "[Without express standards by which to measure an official's actions], post hoc rationalizations by the licensing official and the use of shifting or illegitimate criteria are far too easy, making it difficult for courts to determine in any particular case whether the licensor is permitting favorable, and suppressing unfavorable, expression." *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 758 (1988); *see also BJS No. 2, Inc. v. City of Troy*, 87 F.Supp.2d 800 (S.D. Ohio 1999) (invalidating conditional use zoning scheme on basis that vague criteria for issuance of a permit vested unbridled discretion in government officials).

The exact danger sought to be avoided by the prohibition on unbridled discretion and prior restraints in the First Amendment context arises from the facial terms of the New Rules. Like other ordinances invalidated by the federal courts, the New Rule confers unbridled discretion upon state officials by failing to provide those officials with narrow, objective standards for determining whether to grant or deny permits at Legislative Plaza and other Capitol grounds. *See Shuttlesworth*, 354 U.S. at 150-151 ("[T]he prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional"). Strikingly, the New Rule, which read in pertinent part as follows, provides no criteria at all to even purport to guide the decision-maker:

> Effective immediately and until further notice, all assemblies and gatherings of persons on the State of Tennessee Legislative Plaza, War Memorial Courtyard and Capitol grounds areas in Nashville, Tennessee shall require a use permit from

the Tennessee Department of General Services. Use of any portion of the Capitol grounds also requires the approval of the Tennessee Capitol Commission.

The Department of General Services may issue permits upon proper application and satisfaction of use fees, security and liability insurance requirements for use of the Legislative Plaza, War Memorial Courtyard and Capitol grounds between the hours of 9:00 a.m. and 4:00 p.m.

Special use permits for the Legislative Plaza, War Memorial Courtyard and Capitol grounds during hours outside of the 9:00 a.m. To 4:00 p.m. Period may be approved **at the discretion of the Department on a case by case basis**.

Notwithstanding the above, the Legislative Plaza, War Memorial Courtyard and Capitol ground areas are closed to the public from 10:00 p.m. until 6:00 a.m. daily and no person shall enter upon those premises during this curfew period without specific authorization by the State of Tennessee. In no event shall overnight occupancy of the Legislative Plaza, War Memorial Courtyard or Capitol grounds areas be permitted by any group or individual. (Emphasis added)

While there have been numerous cases discussing whether certain proscribed criteria sufficiently narrow the exercise of governmental discretion to pass constitutional muster, *see, e.g., Shuttlesworth*, 394 U.S. 149-50, those decisions are of little import here; the New Rule provides no guidance whatsoever to the state officials in determining whether to extend the Plaza hours for a specific event. In that regard, the rule is most analogous to the parade permit provision declared invalid in *Forsyth County*, 505 U.S. at 132-33, in which no articulated standards either in the rule or in established practice guided the decision of whether to grant or reject a parade permit application. Noting that the administrator need not rely on any objective factors or even explain the basis for his decision to the applicant, the Court squarely denounced even the possibility for content-discrimination in the issuance of permits. *Id.* "The success of a facial challenge on the grounds that an ordinance delegates overly broad discretion to the decision maker rests not on whether the administrator has exercised his discretion in a content-based manner, but whether there is anything in the ordinance preventing him from doing so." *Id.*

There is nothing on the face of the New Rules that prohibits the State Officials from refusing to issue after-hours permits based on content-discriminatory factors. In this regard, the New Rule does nothing to protect against censorship of viewpoints or, when interpreted broadly, censorship of the mere existence of a viewpoint as opposed to a non-expressive purpose. Further, Thad Watkins testified that he was responsible for the implementation of The New Rules. His testimony in this regard is almost unfathomable: 1) the New Rules were temporary even though they purport to be permanent; 2) no one knew they were temporary except him; 3) the New Rules would expire when Occupy Nashville was evicted; 4) application of the New Rules could be appealed to him even though they did not state so; 5) he had no objective way to evaluate appeals; 6) he'd use his common sense; and 7) he did not know how one would appeal his decision. (AF 36-38).

Where the licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit, there is a risk that he will favor or disfavor speech based on its content. Thus, the Supreme Court has required that a time, place, and manner regulation contain adequate standards to guide the official's decision. Thus, even assuming arguendo, the New Rule imposes a constitutionally valid time, place, and manner restriction on speech, the New Rules nonetheless runs afoul of the First Amendment by permitting content-based application of the rule to silence certain speakers while permitting others. *See Forsyth County*, 505 U.S. at 132-33. There is no question that the New Rules violate the First Amendment in this regard.

> 5.    *It Is Clearly Established that the New Rules Are Impermissible Restrictions on the Plaintiffs' Speech Because They Create Significant Financial Burden without an Exemption*

The New Rules require the payment of a use fee, security fees (which are themselves determined arbitrarily), and proof of $1,000,000 in liability insurance coverage in order to obtain

a permit for use of the Plaza between the hours of 9:00 a.m. and 4:00 p.m. (AF 46). These financial requirements are invalid prior restraints on speech.

In *Forsyth County v. The Nationalist Movement,* the Supreme Court held that vesting a city administrator with discretion to set parade permit fees designed to deal with police costs was unconstitutional, because it would involve the city administrator inquiring about the content of the speech and making determinations of fees based on perception of the speech content:

> There are no articulated standards either in the ordinance or in the county's established practice. The administrator is not required to rely on any objective factors. He need not provide any explanation for his decision, and that decision is unreviewable. Nothing in the law or its application prevents the official from encouraging some views and discouraging others through arbitrary application of fees. The First Amendment prohibits the vesting of such unbridled discretion in a government official. 505 U.S. 123, 133 (1992).

In *Mardi Gras of San Luis Obispo v. City of San Luis Obispo,* 189 F. Supp. 2d 1018, 1031 (C.D. Cal. 2002), the court invalidated an ordinance that, like the New Rules, allowed city administrators to charge a permit fee to defray expenses of police protection, because it necessarily involved speech content regulation. Citing *Forsyth County,* the court held:

> [T]he City of San Luis Obispo administrator must look to the content of the proposed activity to make his or her determination of what City resources will be required. Based on that determination, the City official prepares a budget which may not be revised and which must be paid by the applicant ten days before the event. Thus, the determination of the amount of such service charge will turn on the administrator's view of the resources necessary, a view which may be based on the content of the message.

Additionally, even if the State had clearly defined criteria for setting police and clean-up fees, there must be an exception to ensure that speakers who engage in free speech activities or who are not well-financed are not excluded from exercising their free speech rights in traditional public forums.

The Supreme Court has recognized that a significant requirement for upholding any permit scheme is whether it is "exerted as not to deny or unwarrantedly abridge the right of assembly and the opportunities for the communication of thought and discussion of public questions immemorially associated with resort to public places." *Cox v. New Hampshire,* 312 U.S. 569, 574 (1941). While the State may have an interest in recouping police costs for the use of its public spaces, it should have exceptions for free speech activities and for poorly financed speakers. At least three circuit courts have required that permit schemes provide for an indigency exception to burdensome monetary permit conditions. *See Central Florida Nuclear Campaign Freeze v. Walsh,* 774 F.2d 1515 (11th Cir. 1985), *cert. denied* 475 U.S. 1120 (1986); *Invisible Empire of the Knights of the Klu Klux Klan v. Thurmont,* 700 F.Supp. 281, 286 (D.Md. 1988); *Invisible Empire of the Knights of the Klu Klux Klan v. City of West Haven,* 600 F.Supp. 1427, 1435 (D.Conn. 1985); see *also Eastern Connecticut Citizens Action Group v. Powers,* 723 F.2d 1050 (2d Cir. 1983) ($200 administrative fee unreasonable and unconstitutional); *Stonewall Union v. City of Columbus,* 931 F.2d 1130 (6th Cir. 1991)(The Supreme Court has repeatedly rejected the restriction of expression protected by the First Amendment based on a fear of violence.), *cert. denied,* 502 U.S. 899 (1991); *United Food & Commercial Workers Union Local 442 v. City of Valdosta,* 861 F.Supp. 1570, 1584 (M.D. Ga. 1994); *Gay and Lesbian Services Network v. Bishop,* 841 F.Supp. 295, 296-297 (W.D.Mo. 1993).

The insurance requirement imposed by the State here is a particularly onerous prior restraint because it drives indigent and poorly financed speakers out of the marketplace of ideas. Groups like Occupy Nashville with small or non-existent annual budgets simply cannot afford to purchase the required insurance policy and are therefore effectively silenced by the requirement.

Were such a policy permitted, free speech would be far from free; it would only be available to those with monetary means.

Furthermore, insurance requirements are inherently content-based because insurance companies will take into account the nature of an event and charge more to insure unpopular speakers whose message may be more likely to cause a disturbance. This is the precise sort of "heckler's veto" that the United States Supreme Court forbid in *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 134-135, only here the decision to discriminate against unpopular speakers has been delegated to the insurance companies. The Third Circuit recently ruled that even a monetary provision that seems neutral on its face is unconstitutional if the end result is that disparate costs will be imposed upon speakers based upon the content of the speech and on the popularity or unpopularity of the views expressed. *The Nationalist Movement v. City of York*, 481 F.3d at 185.

For all of these reasons, courts throughout the country have held that insurance requirements, such as the one at issue here, are unconstitutional prior restraints. For example, in addition to the cases cited above, in *Eastern Connecticut Citizens Action Group v. Powers*, 723 F.2d 1050 (2nd Cir. 1983), a case very similar to this one, the state department of transportation attempted to impose a $750,000 insurance requirement on a particular free speech event "to avoid the loss to the State of Connecticut from any and all claims made as a result of plaintiffs' activities." *Id.* at 1056. The court held that the insurance requirement was an unreasonable restraint on the First Amendment because there was no basis for requiring such a large amount of insurance and because there was no evidence that existing civil and criminal laws were insufficient to address the state's concerns. Id. at 1057. See also *Wilson v. Castle*, 1993 U.S. Dist. LEXIS 9726 (E.D. Pa. 1993) (insurance requirement of $100,000 to $1,000,000

unconstitutional where there are other less restrictive methods of satisfying the government's interest); *Pritchard v. Mackie*, 811 F.Supp. 665 (S.D.Fla. 1993) ($1,000,000 insurance requirement unconstitutional and is a burden on poorly financed and unpopular groups); *Collin v. O'Malley*, 452 F.Supp. 577, 578-79 (N.D. Ill. 1978) ($10,000 to $50,000 insurance requirement unconstitutional where record shows that plaintiff and similar speakers cannot obtain insurance); I*nvisible Empire of the Knights of the Ku Klux Klan v. Thurmont*, 700 F.Supp. 281, 285-86 (D. Md. 1988) (insurance requirement unconstitutional because there is no indication that it is necessary).

Here, the New Rules offer no express exception to the financial requirement. (AF 46). Further as stated above in subsection III.B.4, above, there is no legitimate mechanism for appeal from this requirement that would allow one to understand when an exception would be permitted.  In fact, Occupy Nashville informed the State that they could not meet these hefty financial burdens in order to exercise their First Amendment rights.  (AF11-15).  Yet, the State provided them with no exemption from the requirements.  Thus, this imposition of these financial requirements violates the First Amendment's *de* facto prohibition of the free speech of the poor.

> 6.      *It Is Clearly Established that the New Rules Are Impermissible Restrictions on the Plaintiffs' Speech Because They Are Vague and Overbroad.*

The New Rules are also impermissibly overbroad, in that their enforcement necessarily curtails free speech and expression.  A law is overbroad under the First Amendment if it "reaches a substantial number of impermissible applications" relative to the law's legitimate sweep. *New York v. Ferber,* 458 U.S. 747, 771, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982). The overbreadth doctrine exists "to prevent the chilling of future protected expression." *Staley v. Jones,* 239 F. 3d

769, 779 (6th Cir. 2001). Therefore, any law imposing restrictions so broad that it chills speech outside the purview of its legitimate regulatory purpose will be struck down.

The New Rule restricts far more speech than is necessary. For example, a press conference to announce the filing of the instant lawsuit would be prohibited under the New Rules unless the ACLU-TN applied for a permit, paid a permit fee, a security fee and provided proof of $1,000,000 in liability insurance. Such demands are unreasonable, unnecessary and unfair, especially given the historical uses of this particular forum.

The New Rules are also impermissibly vague in that they fail to define key terms within the Rule. For example, they fail to define what is a "gathering" or "assembly." It also instructs that these Rules are applicable to Legislative Plaza, War Memorial Courtyard and the Capitol grounds without defining the boundaries of those locations. "No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes." *Lanzetta v. New Jersey,* 306 U.S. 451, 453, 59 S. Ct. 618, 83 L. Ed. 888 (1939). Indeed, a conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standard less that it authorizes or encourages seriously discriminatory enforcement. *Hill v. Colorado,* 530 U.S. 703, 732, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000); see also *Grayned v. City of Rockford,* 408 U.S. 104, 108-109, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). Although ordinarily "[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others," the Supreme Court has relaxed that requirement in the First Amendment context, permitting plaintiffs to argue that a statute is overbroad because it is unclear whether it regulates a substantial amount of protected speech. *Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494-49 102 S. Ct. 1186, 71 L.Ed.2d 362 (1982); see also

*American Civil Liberties Union,* 521 U.S. 844, 870-874, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997).

Plaintiff Shannon's arrest while attempting to take photographs of the events as she stood on the sidewalk beside Legislative Plaza illustrates how the New Rules are vague. The New Rules are so vague that Plaintiff Shannon could not reasonably have been expected to know that they would be interpreted so as to cover speech on the sidewalks abutting the Plaza. "No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes." *Lanzetta v. New Jersey,* 306 U.S. 451, 453, 59 S. Ct. 618, 83 L. Ed. 888 (1939).

> 7. *It Is Clearly Established that the New Rules Are Invalid Because They Are Not Valid Time, Place and Manner Restrictions.*

Time, place, and manner regulations <u>must</u> "'promote[ ] a substantial government interest that would be achieved less effectively absent the regulation.' " *Ward,* 491 U.S. at 799, 109 S.Ct. 2746 (quoting *United States v. Albertini,* 472 U.S. 675, 689, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985)). " 'The validity of time, place, or manner regulations does not turn on a judge's agreement with the responsible decision maker concerning the most appropriate method for promoting significant government interests' or the degree to which those interests should be promoted." *Id.* at 800, 109 S.Ct. 2746 (quoting *Albertini,* 472 U.S. at 689, 105 S.Ct. 2897) (internal alteration marks removed).

For example, in *Saeig v Dearborn* 641 F.3d 727, (6th Cir. 2011), the Sixth Circuit held that a City's restriction on pedestrian leafleting on public sidewalks within the outer perimeter of a private festival was substantially broader than necessary to further the government's interest in vehicular traffic control, and thus violated First Amendment rights of a Christian pastor who sought to distribute literature outside the festival boundaries, where the primary justification for the outer perimeter was to curb vehicular traffic and to provide parking, not to curb pedestrian

crowds, and there was no evidence of any existing problem of pedestrian traffic in outer perimeter area.

Here, the facts have plainly shown that the State did not have a substantial government interest in restricting use of the Plaza during this period of time. If the State's interest truly was substantial, they would have adopted the curfew that Metro requested nearly a year prior to the arrival of Occupy Nashville on the Plaza. The stated interests were the same: to prevent crime, littering, vandalism, defecation and the like, however, despite those concerns, the State declined to adopt such a policy.

Additionally, the facts have plainly shown that Defendants did not make a single effort to determine if their interests could have been achieved by less drastic measures. Instead of providing more police presence or providing portable toilets, or doing anything to help Occupy Nashville, Defendants chose to utilize the most severe option by ordering the arrest of 55 peaceful protestors.

### D. Plaintiffs Have Standing To Seek Injunctive Relief and Compensatory Damages.

Respectfully, Defendants' argument that Plaintiffs lack standing makes no sense and as a result Plaintiffs have a hard time responding.

Defendants argue that "it was not the Use Policy that caused any alleged damages to the plaintiffs; it was the enforcement thereof. Plaintiffs cannot show any injury or damages from the Use Policy" Brief at 13. Of course, such a rule would eliminate any person's ability to assert any claim under §1983. That cannot be what the Defendants are truly asserting. It seems that the real thrust of this argument is that, because the Plaintiffs failed to apply for a permit under the New Rules, they have lost legal standing to assert a claim for damages. (Apparently, the

Defendants accede that the Plaintiffs had standing to assert their claims for equitable relief.) They cite no case to support this proposition. None exists.

Plaintiffs have demonstrated standing. There is no dispute that the Plaintiffs were arrested and detained after they refused to comply with the New Rules. They suffered an injury when the Defendants illegally arrested them in the middle of the night while they peacefully protested on Legislative Plaza. They were hand cuffed, denied their freedom and silenced. The New Rules, of which the Plaintiffs complain, were the basis for their arrest. There is no speculation – these events did, in fact, occur – even though the Defendants may wish to misremember what happened. Plaintiffs have demonstrated that they had standing when they filed their complaint and that they have it now.

### E. Plaintiffs Have Proven That the Defendants Selectively Enforced the Curfew.

The Supreme Court has explained that a claimant alleging selective enforcement of facially neutral criminal laws must demonstrate that the challenged law enforcement practice "had a discriminatory effect and that it was motivated by a discriminatory purpose." *Wayte v. United States,* 470 U.S. 598, 608, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985). Discriminatory purpose can be shown by demonstrating that the "'decision maker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group.'" *Wayte,* 470 U.S. at 610, 105 S.Ct. 1524 (quoting *Personnel Adm'r of Mass. v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979)).

Determining whether official action was motivated by intentional discrimination "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Village of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 266, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). "[A]n invidious discriminatory purpose may often be inferred from

the totality of the relevant facts, including the fact, if it is true, that the [practice] bears more heavily on one [group] than another." *Washington v. Davis,* 426 U.S. 229, 242, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). [A] multiple-motive analysis applies in the equal protection arena: proof that a decision was "motivated in part by a [. . .] discriminatory purpose .... shift[s] to the [defendant] the burden of establishing that the same decision would have resulted even had the impermissible purpose not been considered.*" Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 270, 97 S. Ct. 555, 50 L. Ed. 2d 450 (1977).

Here, the totality of the relevant facts lead directly to the inference that the New Rules were imposed **because of** their impact on the Plaintiffs: 1) the Metropolitan Government of Nashville and Davidson County had previously asked for a curfew and the Defendants had refused; 2) there had been a chorus of complaints from political figures ensconced in the offices surrounding Legislative Plaza; 3) the Defendants took no intermediate steps to address purported problems regarding sanitary conditions and safety even though they acknowledged these steps could have addressed their concerns; 4) the New Rules were expressly adopted to address the Plaintiffs; 5) immediately upon the New Rules imposition, the Defendants began creating unwritten, arbitrary exceptions to the New Rules; and 6) the Defendants stated the New Rules would be temporary – ending when the Occupy Nashville protests ended.

Likewise, a discriminatory effect is demonstrated by the New Rules' enforcement. The testimony of Thad Watkins is unequivocal. He interpreted and directed the enforcement of the New Rules in a manner that allowed the business guests of the State to violate the policy.

### F. Plaintiffs' Fundamental Rights of Free Speech and To Be Free of Arrest Were Violated in Denying Them Due Process of Law.

While the Defendants cite relevant case law for determining this issue, they ignore the precedent which they cite. "To prevail on its (sic) procedural due process claim, the plaintiffs

must prove that they had a definite liberty or property interest and that such interest was abridged without appropriate process. 'The process requirement necessary to satisfy fourteenth amendment procedural due process comes into play only after plaintiff has shown that it has a **property or liberty** interest.'" *LRL Properties v. Portage Metro Hous. Auth.*, 55 F.3d 1097, 1108 (6th Cir. 1995)(citations omitted)(emphasis added)  A liberty interest includes the right to be free of arrest.

> "While [the Supreme Court] has not attempted to define with exactness the liberty . . . guaranteed (by the Fourteenth Amendment), the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men.'   In a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed.  *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 572, 92 S. Ct. 2701, 2706-07, 33 L. Ed. 2d 548 (1972)(citations omitted)

Here, the un-contradicted proof demonstrates that the Plaintiffs were restrained bodily while they peacefully protested in violation of no validly enacted law.  This deprivation is sufficient to demonstrate a violation of due process – without regard to the question of whether the Plaintiffs may have a property interest in Legislative Plaza.

      **G.**      **The Arrests Were Improperly Conducted.**

          *1.*      *The Custodial Arrest of the Plaintiffs Was Unconstitutional.*

The Fourth Amendment to the United States Constitution and Article I, section, 7 of the Tennessee Constitution both guarantee individuals the right to be free from unreasonable seizures of their persons.[2]  Such seizures must be based on "probable cause, supported by Oath

---

[2] The Tennessee Supreme Court has held that article 1, section 7 of the Tennessee Constitution is identical in intent and purpose with the Fourth Amendment to the United States Constitution in protecting against unreasonable searches and seizures *State v. Downey,* 945 S.W.2d 102, 106 (Tenn.1997).

or affirmation." *Id.* The Supreme Court has interpreted the Fourth Amendment to require police officers to obtain arrest warrants, supported by affidavits that offer probable cause. *See United States v. United States Dist. Ct.,* 407 U.S. 297 (1972); *Ker v. California,* 374 U.S. 23 (1963). Of course, the warrant requirement is subject to "a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

The Supreme Court has identified three types of reasonable, and thus permissible, warrantless encounters between the police and citizens: (1) consensual encounters in which contact is initiated by a police officer without any articulable reason whatsoever and the citizen is briefly asked questions; (2) a temporary involuntary detention or *Terry* stop which must be predicated upon 'reasonable suspicion'; and (3) arrests which must be based upon 'probable cause.' " *United States v. Pearce,* 531 F.3d 374, 380 (6th Cir. 2008) (citing *United States v. Alston,* 375 F.3d 408, 411 (6th Cir. 2004)). This third circumstance, at issue here, requires that an arresting officer have probable cause to believe that the arrestee has committed or is committing a crime. *Pearce,* 531 F.3d at 380 (citing *Devenpeck v. Alford,* 543 U.S. 146, 152 (2004)).

Accordingly, to state a claim of false arrest, a plaintiff must show that the defendant lacked probable cause for such an arrest. *Sykes v. Anderson,* 625 F.3d 294, 305 (6th Cir.2010) (citing *Voyticky v. Village of Timberlake,* Ohio, 412 F.3d 669, 677 (6th Cir. 2005)). The Defendants in this case lacked probable cause for such an arrest, because, as noted above, the New Rules criminalized Constitutionally protected speech and were adopted without due process.

In order to make a finding of probable cause, a reviewing Court must consider the totality of the circumstances and whether the facts and circumstances of which the Defendants had knowledge at the time of the arrest were sufficient to warrant a prudent person in believing that

the Plaintiffs had committed an offense. *Id.* at 306 (citation omitted). The arresting officer's actual motives are irrelevant to the probable cause analysis. *Criss v. City of Kent,* 867 F.2d 259, 262 (6th Cir. 1988) (citing *Scott v. United States,* 436 U.S. 128, 138 (1978)).

Here, the facts and circumstances of the first arrest were as follows: On the afternoon, October 27, 2011, the New Rules were adopted without any process and posted on Legislative Plaza. The Plaintiffs, a group of peaceful protesters, were gathered together at the Plaza to express disagreement with their Government's policies. Friday, October 28, 2011, at approximately three o'clock in the morning, the protesters were told by the Tennessee Highway Patrol that they had ten minutes to leave the Plaza. While some protesters left the Plaza, many did not leave and instead sat in the middle of the Plaza peacefully singing and listening to a recitation of the Declaration of Independence. Just as the warning time ran out, approximately 75 THP officers, acting pursuant to Defendants Cates' and Gibbons' orders, converged on the Plaza. The State Troopers arrested the remaining protesters, bound their hands with "zip ties," and loaded them onto a waiting prison bus, which took them to jail (the Davidson County Sheriff's Criminal Justice Center.)

Upon arrival at the jail, the officers sought to have their actions ratified by a judicial commissioner as required by state law. The Commissioner denied the request, refusing to find probable cause and effectively ordering the protesters' released. Despite this ruling, however, the officers continued to detain Plaintiffs until approximately 8:45 a.m., approximately 5 hours after the Commissioner's order finding no probable cause and ordering their release. The arrested Plaintiffs' release occurred only after officers issued citations.

The circumstances of the second arrest are arguably even more egregious, because they followed the Commissioner's actions the first night. On the second night, Friday, October 28,

2011, the Plaintiffs were again threatened with custodial arrest even though the Defendants knew that the arrests were illegal. At least one Tennessee State Trooper suggested that the Defendants consult with the Tennessee Attorney General and Reporter prior to the second night of arrests. The Defendants ignored the suggestion, and, in an overwhelming show of force, 72 Tennessee Highway Patrol Officers arrested more than two dozen peacefully assembled Occupy Nashville protestors. Ultimately, the second arrest yielded citations as well.

As this Court found (and the Defendants conceded at the hearing on the application for a temporary restraining order), there can be little doubt that the Plaintiff's arrest was unlawful. (See docket entries 11 & 13). Nor can there be any doubt that, on the date of this arrest, the probable cause requirement was a clearly established legal prerequisite. *Illinois v. Gates*, 462 U.S. 213 (1983); *see also Leonard v. Robinson,* 477 F.3d 347, 355 (6th Cir.2007)(probable cause requirement clearly established). *Criss v. City of Kent,* 867 F.2d 259, 262 (6th Cir.1988) (holding that the Fourth Amendment requires a finding of probable cause as a condition for any significant pretrial restraint of liberty); *Sykes v. Anderson,* 625 F.3d 294, 308 (6th Cir.2010).

There is no factual dispute regarding the arrest: the law was invalid, police lacked probable cause, and the Plaintiffs were arrested. Accordingly, summary judgment is appropriate as requested in Plaintiffs' Motion for Summary Judgment and denial of the Defendants' Motion is proper.

 2. *The Custodial Arrest of the Plaintiffs Was Unconstitutional Even if the New Rules Were Constitutionally Firm.*

Even if the New Rules had been valid, a custodial arrest was illegal in this case because Tennessee provides for misdemeanor citations to issue *in lieu of arrest* in these circumstances. Specifically, Tennessee Code Annotated section 40–7–118 provides, in relevant part:

(b)(1) A peace officer who has arrested a person for the commission of a misdemeanor committed in the peace officer's presence . . . shall issue a citation to the arrested person to appear in court in lieu of the continued custody and the taking of the arrested person before a magistrate . . . ."

Tenn. Code Ann. § 40-7-118. Under this statute, "when an officer observes the commission of certain misdemeanors, the officer is required to cite and release the misdemeanant in lieu of effecting a custodial arrest." *State v. Walker,* 12 S.W.3d 460, 464 (Tenn. 2000); *see also State v. Chearis,* 995 S.W.2d 641, 644 (Tenn. Crim. App. 1999). The "cite and release" statute creates a presumptive right to be cited and released for the commission of a misdemeanor in an officer's presence. *Walker,* 12 S.W.3d at 464.

The statute delineates two types of arrests at issue. The first type of arrest is the brief seizure and detention of an individual while the officer issues a citation. *See* Tenn. Code Ann. § 40–7–118(b)(1); *see also Walker*, 12 S.W.3d at n.7(citations omitted) The second type of arrest is described as "continued custody" of an already arrested individual. *Id. (citing* Tenn. Code Ann. § 40–7–118(b)(1). This continued custody of a person already arrested (subjected to a brief seizure and detention) is a custodial arrest. *See id.; see also Chearis,* 995 S.W.2d at 643–44.

Indeed, Tennessee Courts have emphasized this distinction to disallow the custodial aspect of the encounter, because, where the rationale for a custodial arrest is absent, so are the concomitant deprivations of rights. In other words, where a custodial arrest is prohibited, so is the attendant custody. *See Chearis,* 995 S.W.2d at 644.

In this case, the officers, acting pursuant to orders by Defendants Gibbons and Cates, issued full-scale custodial arrests of the Plaintiffs. Specifically, they used zip ties to handcuff the Plaintiffs, dragged them onto a waiting bus, and took the Plaintiffs to jail. The officers ultimately issued citations after the Commissioner refused to ratify the Officers' illegal arrests. This fact, the ultimate issuance of citations, should not obscure the fact that the illegal arrests

occurred, and the Defendants should not be sheltered from liability simply because the Commissioner prevented the issuance of warrants.

### H. The Character of Plaintiffs' Conduct Was a Motivating Factor in the Defendants' Imposition of a Curfew They had Previously Rejected.

The Sixth Circuit has made the elements of a claim for retaliation clear:

> A retaliation claim essentially entails three elements: (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two-that is, the adverse action was motivated at least in part by the plaintiffs protected conduct. *Thaddeus-X v. Blatter,* 175 F.3d 378, 394 (6th Cir. 1999)

The first two elements of this claim are straightforward. As made clear in sections II, C, above, the Plaintiffs were engaged in conduct protected by the First Amendment to the United States Constitution. Likewise, the Defendants arrested the Plaintiffs twice. These arrests and the threat of arrests actually did prevent the Plaintiffs from engaging in political protest and would make a person of ordinary firmness cease the protest. The only real question for the Court is whether the arrests were motivated by the Occupy Protests.

As demonstrated above, the undisputed facts are sufficient for a trier of fact to determine that the Defendants were, in part, motivated by the Plaintiffs' conduct: 1) the Metropolitan Government of Nashville and Davidson County had previously asked for a curfew and the Defendants had refused; 2) there had been a chorus of complaints from political figures ensconced in the offices surrounding Legislative Plaza; 3) the Defendants took no intermediate steps to address purported problems regarding sanitary conditions and safety even though they acknowledged these steps could have addressed their concerns; 4) the New Rules were expressly adopted to address the Plaintiffs; 5) immediately upon the New Rules imposition, the Defendants began creating unwritten, arbitrary exceptions to the New Rules; and 6) the

Defendants stated the New Rules would be temporary ending when the Occupy Nashville protests ended.

When a plaintiff has met this initial burden, the Defendant can still escape liability if they can demonstrate that they would have imposed the curfew in the absence of the Occupy protests. The Defendants cannot make this showing as the facts demonstrate otherwise. They previously declined to impose a curfew when previously confronted with the stated concerns of protection of the park and public. The Defendants have done little more than deny the allegations put forth by Plaintiffs. Such is not sufficient to meet their burden under Federal Rule of Civil Procedure 56 to show affi1matively that there is no genuine issue in dispute. *Thaddeus-X v. Blatter,* 175 F.3d 378, 399 (6th Cir. 1999).

Plaintiffs have presented sufficient proof that the Defendants adopted the New Rules in retaliation for the Plaintiffs' protests on Legislative Plaza. This part of Defendants' Motion for Summary Judgment should be denied.

## I.       Plaintiffs Have Prevailed on All Remaining Claims.

As a result of the Defendants' previous concessions in response to this litigation, Plaintiffs have prevailed on the all the issues of declaratory and injunctive relief. As a result, the Court need not address those issues here.

## IV.    CONCLUSION

Based on the foregoing, Plaintiffs submit that the Defendants' Motion for Summary Judgment should be denied. They have not presented un-contradicted facts which support their claim of qualified immunity, have mischaracterized the events that lead to this dispute, ignored the clear language of the New Rules and provided the Court no legal basis for the dismissal of Plaintiffs' claims.

Respectfully submitted this 11th of April, 2013,

/C. David Briley
C. David Briley, No. 018559
Bone McAllester Norton PLLC
511 Union Street, Suite 1600
Nashville, TN  37219
Telephone:  (615) 238.6392
Facsimile:  (615) 238.6301
dbriley@bonelaw.com
ACLU-TN Cooperating Attorney

Tricia Herzfeld, No. 026014
Senior Counsel
Ozment Law
1214 Murfreesboro Pike
Nashville, TN  37217
Telephone:  (615) 321.8888
Facsimile:  (615) 321.5230
tricia@ozmentlaw.com
ACLU-TN Cooperating Attorney

Patrick Garland Frogge, No. 020763
Bell Tennent & Frogge PLLC
414 Union St Ste 904
Nashville, TN 37219
Phone: 615-244-1110
Fax: 615-244-1114
patrick@btflaw.com
ACLU-TN Cooperating Attorney
ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that on April 11, 2013, a copy of the foregoing *Memorandum in Opposition to Defendants' Motion for Summary Judgment* was served upon the following via the Court's electronic filing system Heather Cairns Ross, Dawn Jordan, CIVIL RIGHTS AND CLAIMS DIVISION, 425 5th Ave N, PO Box 20207, Nashville, TN 37202, dawn.jordan@ag.tn.gov.

/ C. David Briley
C. David Briley