# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

OCCUPY NASHVILLE, PAULA ELAINE  )
PAINTER, MALINA CHAVEZ SHANNON,  )
LAUREN MARIE PLUMMER, ADAM  )
KENNETH KNIGHT, WILLIAM W.  )
HOWELL, DARRIA HUDSON, and KATY  )
SAVAGE,  )
                                         )    **Case No. 3:11-cv-01037**
       **Plaintiffs,**  )    **Judge Aleta A. Trauger**
                                           )
**v.**  )
                                           )
WILLIAM EDWARD ("BILL") HASLAM,  )
GOVERNOR OF THE STATE OF  )
TENNESSEE, WILLIAM L. GIBBONS,  )
COMMISSIONER OF THE TENNESSEE  )
DEPARTMENT OF GENERAL SAFETY,  )
STEVEN G. CATES, COMMISSIONER OF  )
THE TENNESSEE DEPARTMENT OF  )
GENERAL SERVICES, and TENNESSEE  )
HIGHWAY PATROL OFFICERS DOES 1-210,  )
                                           )
       **Defendants.**  )

## MEMORANDUM

        The parties have filed cross-motions for summary judgment under Fed. R. Civ. P. 56. The defendants have filed a Motion for Summary Judgment (Docket No. 69), to which the plaintiffs filed a Response in opposition (Docket No. 79), and the defendants filed a Reply (Docket No. 82). The plaintiffs have also filed a Motion for Summary Judgment (Docket No. 72), to which the defendants filed a Response in opposition (Docket No. 77), and the plaintiffs filed a Reply (Docket No. 86). For the reasons stated herein, both motions will be granted in part and denied in part, and the court will order further submissions concerning damages.

## BACKGROUND

1

# I.    Overview and Procedural History

## A.    General Overview and the Verified Complaint

In October 2011, a group of protestors, styling themselves as the "Occupy Nashville" movement, maintained a 24-hour per day protest on Legislative Plaza in Nashville, Tennessee, a traditional public forum.  On October 27, 2011, the Tennessee Department of General Services ("DGS"), for which defendant Steven Cates serves as Commissioner, issued a so-styled "Use Policy" that, *inter alia*, purported to ban "overnight occupancy" of the Plaza from that day forward.  (*See* Docket No. 72, Ex. 3 to Ex. 1, Use Policy, at p. 1.)  William Gibbons, Commissioner of the Department of Safety ("DOS"), and Tennessee Governor Bill Haslam (via a subordinate) assented to the issuance and implementation of the "Use Policy."[1]  In the early hours of the morning on October 28, 2011 (several hours after DGS issued the Use Policy) and again the following night, Tennessee Highway Patrol ("THP") officers enforced the curfew portion of the Use Policy by arresting *en masse* those protestors who refused to leave the Plaza during the newly designated curfew hours.

The plaintiffs in this action are comprised of two protestors who were arrested on the Plaza both nights (plaintiffs Paula Painter and Marie Plummer), three plaintiffs who were arrested on the first night only (plaintiffs William Howell, Adam Knight, and Darria Hudson), one plaintiff who was arrested on the sidewalk while approaching the Plaza on the second night (plaintiff Malia Shannon), and one plaintiff who left the Plaza on the first night after being threatened with arrest for violating the newly imposed curfew requirement (plaintiff Katy

---

[1]For reasons explained herein, the "Use Policy" was a DGS "policy" in name only, and instead constituted a "rule" for administrative purposes.  For this reason, the plaintiffs in their briefing refer to the so-styled Use Policy document as the "New Rules."  However, for purposes of linguistic simplicity only, the court will refer to that document herein as the "Use Policy."

Savage). Aside from the defendants' arguments specific to plaintiff Shannon, the parties have not drawn any meaningful distinctions among these individual plaintiffs with respect to the pending motions.[2]

On October 31, 2011, the plaintiffs filed a Verified Complaint against (1) Governor Haslam in his official capacity only, (2) Commissioner Cates in his official and individual capacities, and (3) Commissioner Gibbons in his official and individual capacities. The plaintiffs asserted nine counts, including (1) federal constitutional challenges under § 1983 for violation of the plaintiffs' First and Fourteenth Amendment rights (Counts I (facial challenge to the Use Policy) and II (selective enforcement)), due process violations (Count V), unlawful search and seizure of property (Count VII), unlawful arrest (Count VIII), and retaliation for exercising constitutional rights (Count IX); and (2) state law claims for violations of the Tennessee Constitution (Counts III and IV) and the Tennessee Uniform Administrative Procedures Act ("UAPA"), Tenn. Code Ann. § 4-5-101 *et seq.* (Count VI).

From Governor Haslam, Commissioner Cates, and Commissioner Gibbons, the plaintiffs demanded (1) equitable relief, including a declaratory judgment, an injunction (including an immediate temporary restraining order), and the return of all seized items; and (2) attorney's fees and costs under 28 U.S.C. § 1988. From Commissioner Cates and Commissioner Gibbons – but not from Governor Haslam – the plaintiffs also demanded (1) monetary damages for infringement of their First Amendment rights, unlawful detention, and/or retaliation for

_____

[2]The Verified Complaint and Amended Complaint also purported to sue on behalf of "Occupy Nashville," an "unincorporated association." The plaintiffs have not disputed the defendants' contention that "Occupy Nashville" is not a proper party.

exercising First Amendment rights, and (2) punitive damages.[3]  (Docket No. 1.)  Neither the

Verified Complaint nor the Amended Complaint delineated between forms of relief sought

pursuant to the official capacity claims (asserted against all three defendants) as opposed to the

individual capacity claims (asserted against Commissioners Cates and Gibbons only).

###    B.    TRO Hearing and Associated Injunctive Relief

On the afternoon of October 31, 2011 – the date that the plaintiffs filed the Verified

Complaint – the court held a hearing on plaintiffs' demand for a Temporary Restraining Order

("TRO") against enforcement of the Use Policy.  (Docket No. 13, Transcript of TRO hearing.)

The defendants, represented by the Tennessee Attorney's General Office, did not contest the

plaintiffs' position and consented to the TRO.  (*Id.*)  Accordingly, the court granted the requested

TRO, which enjoined the defendants from enforcing the Use Policy.  (*Id.*; Docket No. 11

(TRO).)  The court also observed that it would have granted the TRO regardless of the

defendants' position.  (Docket No. 13.)

On November 16, 2011, the parties filed a Joint Agreed Order Establishing Preliminary

Injunction (Docket No. 14), which the court granted on November 17, 2011 (Docket No. 17).  In

essence, the Preliminary Injunction converted the TRO into an indefinite injunction against

enforcement of the Use Policy without a bond requirement.  (*Id.*)

On January 5, 2012, the plaintiffs filed an Amended Complaint, which remains the

---

[3]The Verified Complaint and Amended Complaint also included several additional claims
and/or demands for forms of relief that the plaintiffs have since abandoned.  First, the plaintiffs
originally demanded class relief under Fed. R. Civ. P. 23, but never moved to certify a class.
Second, the plaintiffs originally sued "John Doe" THP officers, but never identified those
officers and do not dispute that the claims against those officers are no longer viable here.  Third,
although the plaintiffs asserted a claim under the Fifth Amendment to the United Constitution,
they do not dispute that the Fifth Amendment claim is inapplicable here because the defendants
are not federal officials.

operative pleading in this case. For purposes of the instant motions, the demands set forth in the Amended Complaint were essentially the same as those in the Verified Complaint.

In April 2012, the DGS withdrew the Use Policy. Thereafter, pursuant to required agency rulemaking procedures set forth in the UAPA, the DGS promulgated a set of new rules ("Current Rules") governing use of the Plaza and Capitol grounds. *See* Tenn. Comp. R. & Regs. 0690-06-01-.01-.01 to .04 (effective Nov. 20, 2012) ("Rules of the Tennessee Department of General Services, Procedures for Use of the Tennessee War Memorial and Courtyard").[4] The Current Rules became effective on November 20, 2012. The plaintiffs have challenged the constitutionality of the now-superseded Use Policy, but they do not challenge the Current Rules.

## II. Detailed Background Facts[5]

[4]According to the text accompanying the Current Rules, the "original rule" (which was subjected to notice and a public hearing under the UAPA) was filed on August 22, 2012. Tenn. Comp. R. & Regs. 0690-06-01-.01-.01 to 0.4; *see also* 2012 TN Reg. Text 285525 (NS), Notice of Intended Action, 2012tn-h001aft237 (dated Aug. 24, 2012). Although the parties did not file a copy of the Current Rules, the Affidavit of Thaddeus Watkins, filed in support of the defendants' Motion for Summary Judgment, references their promulgation and implementation. (*See* Docket No. 69, Ex. 7 ¶ 8.). The defendants rely on the existence of these Current Rules, which supplanted the "Use Policy," in support of their motion. (*See* Docket No. 70, Defs. Mem., at p. 20.) Therefore, the court takes judicial notice of the Current Rules. *See Toth v. Grand Trunk R.R.*, 306 F.3d 335, 349 (6th Cir. 2002) ("Administrative regulations fall within the category of facts 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'") (quoting Fed. R. Civ. P. 201(b)).

[5]The parties have filed voluminous factual submissions, including statements of undisputed material fact, responses thereto, and evidentiary exhibits. In support of its Motion for Summary Judgment, the defendants filed, *inter alia*, affidavits from State Capitol Complex Facilities Administrator David Carpenter, Commissioner Cates, Assistant Attorney General Dawn Jordan, THP Lieutenant Preston Donaldson, Commissioner Gibbons, Tennessee State Architect Robert Oglesby, and DGS General Counsel Watkins. (*See* Exs. to Docket No. 69; *see also* Docket No. 82, Ex. 2.), along with excerpts from deposition transcripts and plaintiffs' interrogatory responses (*See* Docket Nos. 69 and 82). In support of their Motion for Summary Judgment, the plaintiffs filed, *inter alia*, deposition transcript excerpts, copies of e-mail correspondence, links to videos of the arrests, and a copy of the Use Policy. (*See* Exs. to Docket No. 72.) The court has considered the parties' submissions, including their respective objections

**A.      The 24-Hour Occupy Nashville Protest and the Old Rules Permitting It**

In the fall of 2011, protestors formed in New York City to protest perceived disparities in wealth and power between the wealthiest 1% of the country's citizens and the other 99%. By October 8, 2011, a group of protestors had gathered on the Plaza in Nashville to express similar concerns.[6] Styling themselves as the "Occupy Nashville" movement, these protestors maintained a 24-hour per day presence on the Plaza from about October 8, 2011 forward.

At the time the protestors began utilizing the Plaza for their free speech activities, the DGS was operating under a so-styled "Public Use of War Memorial Plaza Policy" (Docket No. 72, Ex. 2 to Ex. 1). The parties acknowledge that the record contains no indication as to when or how the DGS issued that "policy." Regardless, for reasons explained further herein, the court will refer to that document as the "Old Rules" governing use of the Plaza. The Old Rules stated that the "Plaza is State property which is open for use by the public as a place for expressive activity such as, but not limited to, formal and informal political or social gatherings . . . ." The Old Rules contained provisions governing exclusive and non-exclusive use of the Plaza. With respect to non-exclusive uses, it stated that the "[t]he Plaza may be used free of charge by any person or group for expressive activity on a first come first serve basis." With respect to reserved/exclusive use, it required users to pay a daily administrative fee, to secure $1,000,000 in liability insurance coverage, and to pay for security services (if necessary) at its own expense. Thus, in most relevant part: the Old Rules did not ban overnight use of the Plaza and placed no

concerning allegedly "undisputed" facts, in identifying the facts at issue. Excluding factually unsupported objections to particular facts, the facts are largely undisputed, except where otherwise noted.

[6]The Plaza is referred to interchangeably as the "Legislative Plaza" or the "War Memorial Plaza." For purposes of the pending motions, the court will refer to it as the "Plaza."

6

requirements (fees, insurance, or security) on non-reserved use of the Plaza, subject only to the caveat that non-reserved users would need to defer to reserved users when using the Plaza.

Approximately one year before the Occupy Nashville "occupation" of the Plaza, the DGS had already been made aware that the Old Rules permitted overnight use of the Plaza. At that time, the Nashville Davidson County Metro Government had urged the DGS to issue a curfew and other rules for the Plaza in an effort to reduce urination, defecation, and vandalism from homeless individuals who, at times, had used the Plaza as a "sanctuary" for overnight accommodation. The DGS did not amend the Old Rules in response to Metro's urging.[7]

The Occupy Nashville protestors essentially benefitted, at least initially, from these deficiencies in the Old Rules. That is, no existing law governing the Plaza prevented them from maintaining a non-exclusive 24-hour-per-day protest or from sleeping overnight while doing so.

**B.      The Progress of the Protest and Growing Policy Concerns**

During the continuous Occupy Nashville protest, the protestors held signs and made speeches to express their viewpoints. The protestors also set up tents and sleeping bags for overnight accommodation, utilized cooking stoves and laptops, and set up a food and drink tent from which free food and drinks were distributed to any individuals who joined the protest.

The first few weeks of the Occupy Nashville protest went without any major incidents. Facility Administrator David Carpenter and THP Capital Police Lieutenant Preston Donaldson (either on his own or through subordinate officers) periodically checked on the status of the

---

[7]The defendants argue that the DGS had legitimate reasons for not amending the rules as requested by Metro Nashville, particularly Metro Nashville's request to permit it (as opposed to the state police) to enforce those rules on the Plaza. Whatever the merits of this position, the relevant point is that the State was on notice of a "curfew gap" in the Old Rules well before the Occupy Nashville protest took place in October 2011.

7

Plaza and the protestors to monitor the situation. Although the Occupy Nashville movement did not contain a "leader" as such, it did establish a line of communication between local attorney Tripp Hunt (acting as a voluntary liaison for the protestors) and DGS General Counsel Thaddeus Watkins. In an effort to avoid conflict, Watkins kept Hunt apprised of other events scheduled to occur on the Plaza, such as the Southern Book Festival scheduled to take place on October 14-16, 2011. Through this line of communication, the protestors reached an accommodation with the Southern Book Festival that permitted both groups to utilize the Plaza simultaneously.

However, as the protest continued, serious problems began to surface. Although the protest movement was initially relatively small and manageable, the population "occupying" the Plaza began to swell as homeless individuals joined the protestors, likely drawn by the availability of free food and overnight sleeping accommodations. The protestors welcomed at least some of the homeless individuals into the movement, while other homeless individuals may have simply capitalized on the situation. At any rate, by late October, there was no way to distinguish the independent homeless population on the Plaza from the "true" Occupy Nashville protestors (who may have included some homeless individuals).

As the occupation continued, Facilities Administrator Carpenter and Lieutenant Donaldson observed and/or received reports of increasing health, safety, and sanitation issues at the Plaza. By October 25, 2011, Donaldson and Carpenter collectively had reported a host of issues: individuals had been urinating and defecating on the Plaza, one of the stones composing the Plaza (which cost $3,000 each and take several weeks to replace) had been broken when a trash barrel was pushed over, protestors had driven stakes in the space between the stones to set up their tents, light fixtures had been destroyed or mangled in an effort to locate electrical plugs,

8

brass hose bibs had been stripped, protestors were utilizing open flames, trash was piling up and required constant removal, violent assaults occurred involving the homeless and protestors, dogs were fighting on the Plaza, and there were multiple unconfirmed reports of indecent exposure, public fornication, and drug use.[8]

Carpenter also observed jugs of human feces and urine in and around some of the tents, which individuals were dumping in the bushes on the Plaza. Carpenter reported that "[i]t is my opinion that the protestors have lost control of the situation with the homeless and the environment has become unsanitary and unsafe." (Watkins Aff., Ex. B, 10/25/11 Email from Carpenter, at p. 2.) Also, in an October 25, 2011 email to DGS Counsel Watkins, Attorney Hunt himself reported that the protestors "have had some bad problems with being attacked by the homeless or gangs in the middle of the night. One woman has been assaulted and this weekend one person was sent to the hospital." (Watkins Aff., Ex. A.).

Having been alerted to these mounting concerns, DGS Counsel Watkins reported the

_____

[8]For example, according to an October 25, 2011 email from Lieutenant Donaldson:

The number of tents appears to be increasing as well as the number of complaints. Yesterday evening we received a total of 3 complaints of individuals going behind the magnolia trees and using this area for a bathroom facility. There is a section of the Legislative Plaza now that does not have electricity due to a breaker going out. The group has extended extension cords closer to the War Memorial building to utilize an outlet they found that still works. This morning a complaint come [sic] in to one of my Troopers that one tent on the plaza may contain alcohol and drugs are possibly being sold out of a tent . . . . As I was walking across the Plaza a few minutes ago I saw a young man hobbling along on crutches who resembled one of the ones I had previously spoken with. I asked him what happened and he informed me a homeless Black male had beat the __ out of him. His lips were busted and bruised and his feet were swollen.

(Donaldson Aff., Ex. D.)

9

issues to Commissioner Cates. It does not appear that Commissioner Cates had any knowledge of serious issues at the Plaza before October 25, 2011, nor does it appear that he had contemplated taking any drastic action with respect to the Plaza before that date. At Occupy Nashville's request, Watkins arranged a meeting for October 26, 2011 with liaisons from Occupy Nashville to discuss the mounting issues.

On October 26, 2011, Attorney Hunt and Jane Hussain, appearing on behalf of Occupy Nashville, met with DGS Commissioner Cates, DGS Counsel Watkins, Facilities Administrator Carpenter, and Don Johnson (Carpenter's superior within the DGS), along with DOS General Counsel Roger Hutto, THP Colonel Trott, and Lieutenant Donaldson. Hunt and Hussain reiterated that acts of violence and criminal activity were taking place on the Plaza and asked for the State to provide, at its own expense, portable toilets and additional security. Commissioner Cates denied both requests. Commissioner Cates told the Occupy Nashville representatives that the protestors would be permitted to return to the Plaza every day, but that, as a matter of health and safety, he would have to close the Plaza at night. At some point during or right after the meeting, Commissioner Cates directed Watkins to draft a new "policy" that would incorporate a curfew and permit requirement for use of the Plaza.[9]

Following Commissioner Cates' directive, Watkins performed limited legal research on his own. He testified that he pulled up First Amendment-related cases using Google, but did not independently perform any research on Westlaw or Lexis. He determined that, under *Clark v.*

---

[9]At his deposition, Commissioner Cates repeatedly sought to draw some sort of distinction between directing Watkins to work on draft rules and whether that constituted a directive to "draft" the "policy." It is not clear to the court what distinction Cates sought to draw, other than, perhaps, to make clear that the draft rules would not have been implemented without further discussion and assent from the Governor and Commissioner Gibbons.

10

*Cmt'y for Creative Non-Violence*, 468 U.S. 288, 104 S. Ct. 3065, 82 L. Ed. 2d 221 (1984), and other unspecified cases, the State could impose "time, place, or manner" restrictions on overnight use of the Plaza. Watkins then began drafting a document erroneously styled as a "Use Policy." He received unspecified "assistance" from staff attorney Abigail Lipshie. He did not prepare a legal memorandum concerning his findings.

On October 27, 2011, Attorney Hunt met with Commissioner Cates, Watkins, Lieutenant Donaldson, and Carpenter. Hunt reported that the Occupy Nashville protestors would not leave the Plaza as requested. After that meeting, Watkins completed a first draft of the Use Policy, which purported to impose a curfew and a new permit requirement, among various other conditions.[10] Watkins then met with Governor Haslam's Chief of Staff Mark Cate, Governor Haslam's Counsel Herbert Slatery, Commissioner Gibbons, Commissioner Cates, DOS General Counsel Hutto, THP Colonel Trott, and others. At that meeting, Watkins presented the "Use Policy," discussed whether the "policy" would constitute a reasonable time, place, and manner restriction, and discussed the mandated duties of the DOS and DGS with respect to the protection of state property. Governor's Counsel Slatery made some minor suggestions, which Watkins incorporated.

It is not entirely clear from the record how the attendees purported to ratify the "Use Policy" at the October 27, 2011 meeting. For example, DGS Commissioner Cates called it a "team decision" but could not recall anyone voting on it, while Watkins testified that the Governor's representative had essentially indicated that the Governor would defer to the DGS's judgment on how to deal with the issue. At any rate, apparently everyone involved ultimately

_____

[10]The court discusses the Use Policy and its multiple manifest constitutional deficiencies in more detail herein.

understood that the "Use Policy" would be implemented the next day in substantially the form discussed at the meeting. Apparently, Watkins subjectively believed that the "Use Policy" would only be temporary, but he did not communicate this belief to the other participants at the meeting. The other defendants understood the new requirements to be permanent; indeed, they maintain that Watkins was the only person who understood otherwise. (*See, e.g.*, Docket No. 77, Defs. Resp. to Pltfs. Mot. for SJ, at p. 9 ("Mr. Watkins was the only one who was of the opinion that the Use Policy was temporary").)

No member of the public was informed about or attended the October 27, 2011 meeting, nor did the meetings' attendees provide Occupy Nashville the opportunity to comment on the Use Policy before its immediate implementation. No public hearings were held concerning the Use Policy, and there is no indication that it was posted to the Tennessee Secretary of State website and the administrative register. There is no written record of the meeting's proceedings. Furthermore, the record contains no written documentation purporting to justify the manner in which the DGS, the DOS, and the Governor's office amended the Old Rules in favor of new ones.

Ultimately, on October 27, 2011, the day after this meeting, Carpenter distributed copies of the Use Policy to people who were on the Plaza, the State posted signs on the Plaza about the new requirements, and Watkins emailed a copy of the new requirements to Hunt, stating that "[w]e hope that the protest participants will abide by this new policy and will work with us in obtaining permits to gather at the Legislative Plaza." (Watkins Aff., Ex. C.) Watkins sent a follow-up email to Hunt with a copy of the application for a permit requirement, noting that he would look into whether a security fee would be required. Hunt did not respond to Watkins.

That night, the Occupy Nashville protestors decided not to seek a permit as the DGS had requested. The Tennessee Performing Arts Center ("TPAC"), which is accessible by walking across the Plaza, also learned of the new purported categorical ban on Plaza use after 10 p.m. Notwithstanding the Use Policy's unequivocal language, Watkins decided that TPAC patrons would be permitted to utilize the Plaza after 10 p.m. as a means of egress from TPAC events.

At 3 a.m. on October 28, 2011 (just several hours after DGS purported to issue the Use Policy), THP officers surrounded the Plaza and informed the protestors that they had ten minutes to vacate the Plaza or otherwise face arrest for violating the Use Policy. Within that time frame, approximately 30 people, including plaintiff Savage, left the Plaza voluntarily to avoid arrest. Most if not all of the remaining protestors locked arms and awaited their arrest. Troopers then arrested the remaining protestors, tied their hands with zip ties, and put them in a Department of Corrections bus, which transported them to the Davidson County jail. While they were being arrested, these protestors sang "We Shall Overcome" and recited the Declaration of Independence.[11]

The Judicial Commissioner on duty that night, Tom Nelson, refused to sign the warrants for the protestors' arrests, stating that the arrestees had not been given sufficient notice. Notwithstanding this ruling, the officers detained the arrestees for 3-4 hours while they prepared arrest citations for "criminal trespass." During that time frame, Colonel Trott spoke with Commissioner Gibbons about Judicial Commissioner Nelson's refusal to issue the arrest

---

[11]The plaintiffs provided links to two unauthenticated YouTube videos of each set of arrests. Although it is not material to the court's analysis, the videos, if properly authenticated, would show both that the protestors were demonstrating peacefully and that the arresting officers appeared to be relatively gentle in arresting them.

warrants. Commissioner Gibbons attempted to call the District Attorney at about 4 A.M. regarding the issue, but the District Attorney did not answer. The arrestees were ultimately released, at which point they returned to the Plaza to resume their occupation.

Just after midnight on October 29, 2011 (*i.e.*, the next night), essentially the same set of events transpired: THP officers gave a ten-minute warning, after which they arrested the remaining protestors and transported them to jail. Again, Judicial Commissioner Nelson refused to sign the arrest warrants, this time stating that probable cause was lacking. Following this ruling, the officers again issued misdemeanor citations to the protestors and released them.

On the nights of October 29 and October 30, the State did not attempt to arrest the protestors or to implement the Use Policy in any respect.

## III. Clarifications Regarding Remaining Claims at Issue

The record requires clarification as to which claims and forms of relief remain at issue in this lawsuit.

### A. Declaratory and Injunctive Relief Are No Longer at Issue

Plaintiffs already prevailed on their demand for injunctive relief against enforcement of the Use Policy. Although the defendants argue that the plaintiffs have "abandoned" their claims for injunctive and declaratory relief, that characterization is misleading. The plaintiffs do not presently need declaratory or injunctive relief because they already successfully opposed enforcement of the Use Policy, which the DGS rescinded in April 2012 and formally replaced with the Current Rules on November 20, 2012. Under these circumstances, declaratory relief would not resolve this case and would not settle the legal relations between the plaintiffs and the defendants going forward. *See Grand Truck W. R.R. Co. v. Consol Rail Corp.*, 746 F.2d 323,

14

326 (6th cir. 1984).[12]

Therefore, only claims seeking money damages relief remain for the court's resolution at this stage, including compensatory damages, punitive damages, and attorney's fees. Put another way, the plaintiffs have already prevailed on their official capacity claims and now seek money damages against the defendants in their individual capacities.[13] Aside from the defendants' standing challenge – which the court rejects – the parties have not addressed the issue of damages, instead focusing on liability issues. Therefore, the court's disposition of the pending motions will resolve liability issues only.

**B.**    **The Plaintiffs Do Not Seek Relief from Governor Haslam in his Individual Capacity**

The court has identified one issue not addressed in the parties' respective submissions: the plaintiffs sued Governor Haslam in his *official capacity only* and do not seek monetary damages from him under § 1983. (*See* Am. Compl. ¶ 12 and at pp. 18-19). Thus, the court's analysis concerning whether "the defendants" can be held individually liable for money damages under § 1983 – including the court's analysis of whether the circumstances justify qualified immunity with respect thereto – is inapplicable to Governor Haslam. The plaintiffs defined the

---

[12]The court previously addressed this issue in the companion case of *Krinks v. Haslam*, No. 3:12-cv-01095, 2013 WL 1873344, at *4 (M.D. Tenn. May 3, 2012). As the court noted therein, the court would still, as here, make findings concerning the constitutionality of the subject actions in resolving the merits of the remaining claims. Moreover, for the reasons stated herein, if the defendants had continued to seek to enforce the Use Policy through the present date, the court undoubtedly would have issued a declaratory judgment that the Use Policy was not a valid law and that it would have been unconstitutional to enforce it in any respect.

[13]The parties' briefs on their cross-motions for summary judgment do not address the issue of whether plaintiffs seek punitive damages and/or attorneys' fees with respect to their successful claims for injunctive relief, let alone what fees would reasonably be attributable to those claims.

scope of their claims and are not entitled to relief against Governor Haslam that they never requested.[14]

## C.    Abandoned Claims

In response to the defendants' Motion for Summary Judgment, the plaintiffs do not contest that the following claims are subject to dismissal: (1) claims for monetary damages for violations of the Tennessee Constitution (Count III and IV), which are not available under Tennessee law in the first place, *see Cline v. Rogers*, 87 F.3d 176, 179 (6th Cir. 1996) (citing *Lee v. Ladd*, 834 S.W.2d 323, 324-25 (Tenn. Ct. App. 1992)); (2) claims for monetary damages for violations of the UAPA (Count VI), which Tennessee does not recognize as an independently actionable claim, *see Colonial Pipeline Co. v. Morgan*, 263 S.W.3d 827, 850 (Tenn. 2008); and (3) claims for the return of personal property (Count VII). The court construes the plaintiffs' silence as implicit abandonment of those specific claims and/or demands for particular forms for relief. *See Gibson-Homes v. Fifth Third Bank*, 661 F. Supp. 2d 905, 912 (M.D. Tenn. 2009); *Dage v. Time Warner Cable*, 395 F. Supp. 2d 668, 679 (M.D. Tenn. 2005).[15]  Therefore,

_____

[14]Indeed, as explained herein, § 1983 does not authorize money damages claims against state officials acting in their official capacity. However, § 1983 does permit equitable relief against an officer acting in his official capacity, because equitable claims against an officer acting in his or her official capacity do not constitute claims against "the state" that are otherwise exempt from § 1983. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 n.10, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989) ("Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983, because 'official capacity actions for prospective relief are not treated as actions against the State.'") (quoting *Kentucky v. Graham*, 473 U.S. 159, 165-66, 105 S. Ct. 3099, 3104-3105, 87 L. Ed. 2d 114 (1985)).

[15]The plaintiffs do not oppose the defendants' argument that, even if the court needed to reach the issue, the court does not have jurisdiction to grant equitable relief against the defendants for violating the Tennessee Constitution. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 120, 104 S. Ct. 900, 79 L. Ed. 2d 67 (1984) ("[A] claim that state officials violated state law in carrying out their official responsibilities is a claim against the

16

summary judgment in favor of the defendants on Counts III, IV, VI, and VII is warranted without further analysis.

### D.     Remaining Claims: Individual § 1983 Claims Against Gibbons and Cates

The only remaining claims at issue in the pending motions are the § 1983 claims asserted against Commissioners Gibbons and Cates in their individual capacities, which seek monetary damages relief for (1) violation of the plaintiffs' First Amendment rights (Count I); (2) selective enforcement of the Use Policy (Count II); (3) violation of the plaintiffs' right to be free from a deprivation of liberty without due process (Count V); (4) unlawful arrest (Count VIII) and (4) retaliation for exercising First Amendment rights (Count IX).[16]

### SUMMARY JUDGMENT STANDARD

"[O]n cross-motions for summary judgment, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration."  *Dixon v. Univ. of Toledo*, 702 F.3d 269, 273 (6th Cir. 2012).  Summary judgment is appropriate if "the movant shows that there is no genuine dispute

---

State that is protected by the Eleventh Amendment," and this bar "applies to pendent claims as well").

[16]Again, the parties have not directly briefed the plaintiffs' potential entitlement to "judgment" and fees with respect to the official capacity injunctive relief claims under 28 U.S.C. § 1988, which are permitted notwithstanding the Eleventh Amendment.  *See Hutto v. Finley*, 437 678, 693, 98 S. Ct. 2565, 57 L. Ed. 2d 522 (holding that § 1988 authorizes federal courts to award attorney's fees against state for a successful suit under § 1983 against state officers acting in official capacity); *accord* Weisenberger *v. Huecker*, 593 F.2d 49, 52 n.7 (6th Cir. 1979).  Also, as to the remaining § 1983 claims against Commissioners Cates and Gibbons in their official capacities, the parties have not addressed the appropriate measure of the plaintiffs' damages or presented evidence from which the court could resolve that issue.  The court proceeds under the assumption that the plaintiffs, if successful, would at least be entitled to nominal compensatory damages with respect to their claims for retrospective relief against Commissioners Cates and Gibbons.

17

as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* (quoting

Fed. R. Civ. P. 56(a)).

**ANALYSIS**

**I.    OVERVIEW**

The plaintiffs demand retroactive compensation from Commissioners Cates and Gibbons

under § 1983 for alleged deprivations of the plaintiffs' rights under the United States

Constitution.[17]  In response to a personal capacity suit, the state official sued may assert

"personal immunity defenses," such as absolute immunity and/or qualified immunity.  *Kentucky*,

473 U.S. at 166-67.  Those defenses are not available in official capacity suits.  *See Kentucky*,

473 U.S. at 167 (stating that "[t]he only immunities that can be claimed in an official capacity

action are forms of sovereign immunity that the entity, *qua* entity, may possess, such as the

Eleventh Amendment.")[18]  Commissioners Cates and Gibbons argue that they are entitled to

qualified immunity with respect to the plaintiffs' remaining individual capacity claims.

**II.    QUALIFIED IMMUNITY**

**A.    Legal Standard**

The doctrine of qualified immunity protects government officials from liability for civil

damages insofar as their conduct does not violate clearly established statutory or constitutional

---

[17]It is well accepted that plaintiffs may recover from a state official personally – payable out of the officer's personal assets – even where, as here, the official's conduct related to his or her official duties.  *See Kentucky*, 473 U.S. at 165-166; *Arizonans for Official English v. Arizona*, 520 U.S. 43, 117 S. Ct. 1055, 137 L. Ed. 2d 170, at 68 n.24 (1997).

[18]Here, the parties have extensively briefed whether the doctrine of "qualified immunity" applies, but they have not briefed the issue of Tennessee's sovereign immunity.  In so doing, the parties have effectively acknowledged that the remaining claims for the court to resolve are personal capacity claims, which are only asserted against Commissioners Cates and Gibbons.

rights of which a reasonable person would have known. *Pearson v. Callahan*, 555 U.S. 223, 231 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)); *accord Martin v. City of Broadview Heights*, 712 F.3d 951, __ (6th Cir. 2013);[19] *Hearring v. Sliwowski*, 712 F.3d 275, 279 (6th Cir. 2013).

Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. *Id.* The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id.*; *see also Anderson v. Creighton*, 483 U.S. 635, 638, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987) (qualified immunity provides "government officials with a qualified immunity, shielding them from liability for civil damages . . . as long as their actions could have reasonably been consistent with the rights they are alleged to have violated.") The doctrine of qualified immunity provides an immunity from suit, not just a mere defense to liability. *Poe v. Hayden*, 853 F.2d 418, 424 (6th Cir. 1988) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985)).

There is some tension among Sixth Circuit panel decisions as to whether courts should apply a two-part inquiry or a three-party inquiry in determining whether a defendant is entitled to qualified immunity. Under the two-part test, the court considers only whether (1) the facts show that the officers violated a plaintiff's constitutional rights; and (2) whether that right was "clearly

---

[19]For reasons that are not self-evident, the version of *Martin v. City of Broadview Heights* available on Westlaw does not contain page numbering, except for the first page of the opinion.

established." *See Martin*, 712 F.3d at __ ("In determining whether a government official is entitled to qualified immunity, the court applies a two-tiered inquiry.") (citing *Austin v. Redford Twp. Police Dep't*, 690 F.3d 490, 496 (6th Cir. 2012)). In other cases, the Sixth Circuit has stated that, if the first two conditions are met, courts may also consider "whether the plaintiff offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Drogosch v. Metcalf*, 557 F.3d 372, 377 (6th Cir. 2009) (stating that the Sixth Circuit has "occasionally" considered this third element to "'increase the clarity' of the analysis) (quoting *Estate of Carter v. City of Detroit*, 408 F.3d 305, 311 n.2 (6th Cir. 2005)); *Sample v. Bailey*, 409 F.3d 689, 696, 696 n.3 (6th Cir. 2005) (providing detailed rationale for application of three-step approach).[20]

Here, the defendants posit that the three-part test applies, whereas the plaintiffs directly address only whether their rights were "clearly established" without addressing whether the court is obligated to consider the "objective reasonableness" of the defendants' actions. Here, unlike other cases in which courts have applied only the two-part inquiry, it would be unfair to the defendants to deny them qualified immunity simply based on the conclusion that they violated the plaintiffs' clearly established First Amendment rights, because the defendants were attempting to respond to a pressing public policy issue. Thus, the court finds that, under the circumstances presented, the three-part inquiry is appropriate. The plaintiffs must establish each of these elements to defeat the defendants' assertion of qualified immunity. *Sample*, 409 F.3d at

---

[20]*See also Moldowan v. City of Warren*, 578 F.3d 351, 375 (6th Cir. 2009) (noting potential for tripartite standard); *Barnes v. Wright*, 449 F.3d 709, 715 (6th Cir. 2006); *Richardson v. Nasser*, 421 F. App'x 611, 616 (6th Cir. 2011) (citing tri-partite standard).

695-96 (citing *Radvansky v. City of Olmstead Falls*, 409 F.3d 689, 695 (6th Cir. 2005)).

**B.      The Old Rules, the Use Policy, and the UAPA**

Here, the application of the qualified immunity doctrine turns on matters relating to an interplay among the Old Rules, the Use Policy, the UAPA, and the First Amendment. Thus, to properly frame the qualified immunity analysis, the court will address the relationships among the foregoing.

### 1.      DGS Authority to Make Rules and Policies

By statute, the DGS has authority to preserve the Plaza and to issue regulations concerning its usage. *See* Tenn. Code Ann. § 4-3-1105 ("The department of general services has the power and is required to . . . (8) Supervise the maintenance of public buildings and capital annexes . . . and of the capitol grounds . . . (11) Supervise and maintain all public memorials and monuments erected or owned by the state . . . (12) Exercise general custodial care of real property of the state[].") and 4-4-103 ("The commissioner of each department is empowered to prescribe regulations, not inconsistent with the law, for . . . the custody, use and preservation of the . . . property pertaining thereto").

In exercising its authority, the DGS (as well as any other state agency) can issue "policies" or "rules." As defined in the UAPA, a "policy" is "a set of decisions, procedures and practices pertaining to the *internal operation* or actions of an agency." Tenn. Code Ann. § 4-5-102(10) (emphasis added). By contrast, a "rule" means "each agency statement of general applicability that implements or prescribes law or policy," expressly including an "amendment or repeal of a prior rule . . . [,]" but excluding "[g]eneral policy statements that are substantially repetitious of existing law" and "[s]tatements concerning *only internal management of state*

21

*government* and *not affecting private rights, privileges or procedures available to the public*."
*Id.* §§ 4-5-12, 12(A) (emphases added), and 12(D). Thus, "a policy is not a rule under the UAPA
if the policy concerns internal management of state government *and* if the policy does not affect
the private rights, privileges, or procedures available to the public." *Mandela v. Campbell*, 978
S.W.2d 531, 534 (Tenn. 1998) (emphasis in original).

"Rulemaking is essentially a legislative function because it is primarily concerned with
considerations of policy." *Tenn. Cable Television Assoc. v. Tenn. Pub. Serv. Comm'n*, 844
S.W.2d 151, 161 (Tenn. Ct. App. 1992). "It is the process by which an agency lays down new
prescriptions to govern the future conduct of those subject to its authority." *Id.*

Under the UAPA, when an agency seeks to promulgate regulations that constitute a
"rule", "[a]n agency shall precede all its rulemaking with notice and a public hearing unless . . .
[t]he rule is adopted as an emergency rule . . . ." Tenn. Code Ann. § 4-5-202(a)(1).[21] Thus,
absent issuance of an "emergency rule," Tennessee agencies must issue formal notice and
conduct a public hearing before making a rule. *Mandela*, 978 S.W.2d at 533. Section 4-5-203
imposes a host of requirements related to the "public hearings"; for example, the agency must
transmit a notice of the hearing to the secretary of state for publication in the notice section of
the administrative register no earlier than 45 days before the hearing, the agency must "afford all
interested persons or their representatives an opportunity to present facts, views or arguments
relative to the proposal under consideration," and the agency must "consider fully all written
and oral submissions respecting proposed rules." Even after an agency decides on the language

---

[21]Tenn. Code Ann. § 4-5-110 also includes other exceptions to the rulemaking procedures
that are not relevant here. The court discusses emergency rulemaking procedures in the next
section.

of a particular rule, it may not become effective "until such rule has been filed with the office of the attorney general and reporter." *Id.* § 4-5-211. Specifically, "[t]he office of the attorney general and reporter *shall review the legality and constitutionality of every rule* filed pursuant to this section and *shall approve or disapprove of rules based on the attorney's general's determination of the legality of such rules*." *Id.* (emphases added); *Mandela*, 978 S.W.2d at 533 (stating that "rules within the ambit of the UAPA" require "approval by the attorney general.") "Such procedures allow persons affected by proposed rules to make their voices heard in favor of or in opposition to such rules and to make such suggestions for changes." *Cosby v. State Dep't of Human Servs.*, No. M2003-02696-COA-R3-CV, 2005 WL 2217072, at *2 n.5 (Tenn. Ct. App. Sept. 15, 2005).

"Any agency rule not adopted in compliance with the provisions of [the UAPA] shall be void and of no effect and shall not be effective against any person or party nor shall it be invoked by the agency for any purpose." *Cosby*, 2005 WL 2217072, at *3 (quoting Tenn. Code. Ann. § 4-4-216). Thus, "failure to promulgate a rule as contemplated by the UAPA renders the rule void." *Mandela*, 978 S.W.2d at 533 (citing Tenn. Code Ann. § 4-5-216); *see also* Tenn. Op. Atty. Gen. No. 99-213, 1999 WL 1013010, at *3 (Oct. 27, 1999).

A DGS time, place, or manner regulation for the Plaza necessarily restricts the public's First Amendment right to utilize the Plaza for free speech activity, among other freedoms. Because such a regulation "impacts the private rights and privileges of the public," it constitutes a "rule." *See Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515, 59 S. Ct. 954, 83 L. Ed. 1423 (1939) ("Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and . . . have been used for purposes of assembly, communicating

23

thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens."); *see also Cosby*, 2005 WL 2217072, at *3 (where State Department of Human Services issued a so-styled "policy" that resulted in rescission of welfare benefits to potential recipient, its implementation "clearly affects private rights and privileges, so is not subject to the exception for statements affecting only the internal management of state government.") By the same token, these types of restrictions do not relate to the "internal" management of state government – *i.e.*, they do not constitute policies. Thus, under the test articulated in *Mandela* pursuant to the plain language of the UAPA, DGS regulations concerning the time, place, and manner under which the public may utilize the Plaza constitute "rules" that must be promulgated in compliance with the UAPA. *See also* Tenn. Op. Atty. Gen. No. 11-63, 2011 WL 4907410, at *2 (Aug. 26, 2011) (finding that board of control of Tennessee Corrections Institute was required to comply with UAPA rulemaking procedures with respect to setting minimum jail standards); Tenn. Opp. Atty. Gen. No. 99-213, 1999 WL 1013010, at *2 (Oct. 27, 1999) (where Tennessee Department of Health sought to change licensing examination standards for nurse aides, department was required to utilize rulemaking procedures because changes "implemented" or "prescribed" law or policy).

3. Emergency Rulemaking Procedures

The UAPA contains an "emergency" exception to the usual notice and hearing requirement. Under that exception, "[a]n agency may, upon stating its reasons in writing for making such findings, proceed without prior notice or hearing to adopt an emergency rule, if the agency finds that . . . [an] immediate danger to the public health, safety or welfare exists, and the

24

nature of this danger is such that the use of any other form of rulemaking authorized by this chapter would not adequately protect the public." Tenn. Code Ann. § 4-5-208(a)(1).

An emergency rule "shall become effective immediately . . . upon a copy of the rule and a copy of the written statement of the reasons for the rule being filed with the secretary of state." *Id.* § 4-5-208(b). The emergency rule may remain effective for up to 180 days. *Id.* The attorney general must approve emergency rules, as well. *Id.* § 4-5-211 ("No rule shall be filed in the office of the secretary of state until such rule has been filed with the office of the attorney general and reporter.") With respect to emergency rules, the only caveat is that "[t]he attorney general and reporter shall not disapprove an emergency rule filed pursuant to § 4-5-208 solely on the basis of failure to meet the statutory criteria for adoption of the rule contained in this chapter, *unless the attorney general and reporter determines and states in writing that the attorney general and reporter could not defend the legality of the rule* on the basis of failure to meet the statutory criteria for adoption of the rule contained in this chapter, in any action contesting the legal validity of the rule." *Id.* (emphasis added).

    4.    <u>Rules Governing the Plaza: The Old Rules and the "Use Policy"</u>

Here, neither side knows the origin of the so-styled "Public Use of War Memorial Plaza Policy" that was in place before October 27, 2011. Because that document purported to be of general applicability to the public, the court will refer to it, as do the plaintiffs here, as constituting a set of "Old Rules," whether or not it was actually promulgated pursuant to the UAPA (as it should have been). At any rate, regardless of the manner in which the DGS issued it, the State and the public treated the Old Rules as the existing state of the law governing usage of the Plaza.

The defendants do not actually dispute that, under the Old Rules, the plaintiffs were not precluded from utilizing the Plaza on a non-exclusive basis without a permit, or that the Old Rules contained no limitation concerning overnight use of the Plaza (for free speech activities or otherwise). It does appear that, before October 2011, no group had actually sought to capitalize on this loophole in the usage restrictions; that is, every group seeking to utilize the Plaza for large-scale activities had sought a permit and had complied with existing "Rental Requirements" for its reserved use. Thus, it seems that the Occupy Nashville movement was the first organization to capitalize on these loopholes in the Old Rules to "occupy" the Plaza and to do so overnight on a non-exclusive basis. In this manner, Occupy Nashville utilized the Plaza for its occupation without violating the then-operative usage restrictions.

On October 26 and 27, 2011, the defendants sought to close the loophole by adopting a new "Use Policy" that would prohibit overnight use of the Plaza and that would require a permit for "gatherings" and "assemblies" to utilize the Plaza for any purpose. For the reasons stated in the previous section, the "Use Policy" was a "policy" in name only, because it affected the rights and privileges of the public – including the Occupy Nashville protestors – to utilize the Plaza for free speech activity.[22] The defendants did not comply with the traditional rulemaking procedures or with the emergency rulemaking procedures.[23] Instead, they adopted the Use Policy behind

---

[22]The court rejects the defendants' argument that the Use Policy was "substantially repetitious of existing law." The document purported to amend and/or abrogate the Old Rules by imposing various new requirements and limitations on usage of the Plaza. These new requirements were intended to vary the Plaza restrictions from the *status quo*.

[23]The Use Policy did not contain any inherent time limitation on its validity and did not purport to be a set of "emergency rules." Indeed, the defendants argue that they all understood that the document was meant to have a permanent (or at least indefinite) effect going forward. Regardless, even if the defendants had invoked the emergency provisions – which they did not –

26

closed doors without engaging in any formal process. Indeed, there is no written record of the proceedings and, at deposition, its participants could not even provide a coherent explanation as to how it was adopted or ratified at the October 27, 2011 meeting.

The defendants' failure to comply with those procedures meant that, by operation of the UAPA's plain language, the Use Policy was void and of no effect *ab initio*.

5. Whether the Plaintiffs Had a Clearly Established Right to Occupy the Plaza.

As the Sixth Circuit has explained:

For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. A right is clearly established if there is binding precedent from the Supreme Court, the Sixth Circuit, the district court itself, or other circuits that is directly on point. However, this is not to say that an official action is protected by qualified immunity unless the very action in question previously has been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent. A public official could still be on notice that his conduct violates established law even in novel factual circumstances.

*Holzemer v. City of Memphis*, 621 F.3d 512, 527 (6th Cir. 2010) (internal citations, quotation marks, and brackets omitted).

"[I]t is fundamental that the First Amendment prohibits governmental infringement on the right of free speech. Similarly, the Fourteenth Amendment, which prohibits the states from denying federal constitutional rights and which guarantees due process, applies to acts of the states . . . ." *Rendell-Baker v. Kohn*, 457 U.S. 830, 837, 102 S. Ct. 2764, 73 L Ed. 2d 418 (1982); *see* U.S. Const., Am XIV ("No State shall make or enforce any law which shall abridge the privileges and immunities of citizens of the United States; nor shall any State deprive any

_____

their issuance of the Use Policy did not comply with the UAPA's emergency rule requirements.

person of life, liberty, or property, without due process of law."); *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 489 n.1, 116 S. Ct. 1495, 134 L. Ed. 2d 711 (1996) ("Although the test of the First Amendment states that "Congress shall make no law . . . abridging the freedom of speech, or of the press," the Amendment applies to the States under the Due Process Clause of the Fourteenth Amendment.")  Free speech activity is a type of "liberty" interest that the government may not abridge without due process.  *Jackson v. City of Columbus*, 194 F.3d 737, 749 (6th Cir. 1999).

        As a general matter, although the government may restrict the public's right to utilize public spaces for assembly and communication "through appropriate regulations, that right remains unfettered unless and until the government passes such regulations."  *Dean v. Byerley*, 354 F.3d 540, 551 (6th Cir. 2004).  Thus, although a state "may punish conduct" in a public place "which is in violation of a *valid law*," *Jamison v. State of Tex.*, 318 U.S. 413, 416, 63 S. Ct. 669 (1943) (emphasis added) (citing *Chaplinsky v. New Hampshire*, 315 U.S. 568, 62 S. Ct. 766, 86 L. Ed. 2d (1942)), a state may not restrict First Amendment rights, absent valid time, place, or manner restriction.  *See Dean*, 354 F.3d at 551; *Galvin v. Hay*, 374 F.3d 739, 751 (9th Cir. 2004) ("As speakers may generally control the presentation of their message by choosing a location for its importance to the meaning of their speech, speakers may ordinarily – absent a valid time, place and manner restriction – do so in a public forum."); *Childs v. Dekalb Cnty., Ga.*, 286 F. App'x 687, 693-94 (11th Cir. 2008) (denying qualified immunity and stating that, based on Supreme Court precedent, "police officers have known for decades that protestors present on public property have a First Amendment right to peacefully express their view, in the absence of narrowly tailored ordinances restricting the time, place, or manner of the speech").

The defendants argue that, under *Clark v. Cmt'y for Creative Non-Violence*, 468 U.S. 288, the plaintiffs did not have a "clearly established right" to utilize the Plaza for free speech activity, thereby justifying issuance of the Use Policy. In *Clark*, the plaintiffs had sought to stage a demonstration on the District of Columbia's Lafayette Park and Mall that would involve protestors sleeping in symbolic "homeless tents." *Id.* at 291-92. Under existing National Park Service regulations, overnight "camping" was permitted only in designated campgrounds, a definition that did not include Lafayette Park and the Mall, *id.* However, the regulations did permit overnight 24-hour vigils and the erection of tents (as apart from sleeping in them). *Id.* at 297. Relying on these regulations, the National Park Service permitted the protestors to erect two symbolic tent cities on the federal properties at issue, but refused to permit them to sleep overnight in those tents pursuant to the existing camping restrictions. *Id.* at 292. The plaintiffs challenged the federal National Park Service's application of these regulations, arguing that they violated the plaintiffs' First Amendment rights. The Supreme Court upheld the camping restrictions as reasonable time, place, and manner restrictions, because the regulation "narrowly focuses on the Government's substantial interest in maintaining the parks in the heart of our Capital in an attractive and intact condition . . . . " *Id.* at 296.

Here, the defendants' position inverts the holding of *Clark*. *Clark* did not find that the First Amendment *forbids* citizens from utilizing public property for overnight activity (camping or otherwise); it merely held that, because the government has a substantial interest in preserving public property, the government *may* forbid overnight sleeping on such property. Indeed, in *Clark*, the Court commented that the regulations at issue actually permitted 24-hour use of Lafayette Park and the Mall and the erection of tents thereupon. *Id.* at 297. The court noted in

29

*dicta* its "serious doubt" that the Constitution "required" the National Park Service to permit a 24-vigil and the erection of tents, *id.* at 296. Notwithstanding that doubt as to what the National Park Service was constitutionally *required* to permit, the Court essentially found that it was appropriate for the Park to permit 24-hour vigils and the erection of tents on the Park and the Mall while simultaneously forbidding sleeping in those tents as a matter of general application. Thus, *Clark* did not abrogate the well-established principle that free speech activity is permitted in traditional public fora, absent the existence of a valid time, place, or manner restriction.

Furthermore, the plaintiffs here were not arrested for "camping" as such; they were arresting for being *present* on the Plaza between the hours of 10 p.m. and 6 a.m., regardless of whether they were among the protestors who had set up sleeping arrangements. Thus, *Clark* 's holding that the government may ban sleeping in tents on "non-campground" federal property maintained by the National Park Service is inapposite. Moreover, *Clark* involved a situation in which plaintiffs challenged an *existing* time, place, and manner regulation, that had been in place before the plaintiffs sought to engage in activity that the regulation prohibited. In *Clark*, the parties did not dispute that, apart from its potential effect on the plaintiffs' First Amendment freedoms as applied, the regulation in question was otherwise a valid and properly promulgated law. Here, by contrast, the defendants attempted to *change* the law overnight without following required processes, rendering that law void *ab initio* under Tennessee law.

Here, the Old Rules in effect through October 27, 2011 permitted the plaintiffs to utilize the Plaza, which is a traditional public forum, for overnight free speech activity. *See Glasson v. City of Louisville*, 518 F.2d 899, 904 (6th Cir. 1975) ("The right of an American citizen to criticize public officials and policies and to advocate peacefully for change is the central

30

meaning of the First Amendment.")  That is, no time, place, or manner restriction prevented the plaintiffs from utilizing the Plaza for overnight protest.  Thus, the plaintiffs had a clearly established constitutional right to utilize the Plaza to engage in overnight protest activity.  *See Dean* 354 F.3d at 551; *Jamison.*, 318 U.S. at 416; *Galvin*, 374 F.3d at 751; *Childs*, 286 F. App'x at 693-94.[24]  Indeed, if the defendants actually understood the Old Rules to mean otherwise, they would not have needed to adopt a new law to drive the protestors off of the Plaza at night.  Of course, the fact that the plaintiffs had a clearly established First Amendment right to utilize the Plaza for their overnight speech activity does not mean that they could do so while violating *existing* laws of neutral application, such as laws against vandalism, public urination, indecent exposure, and the like.  Thus, for example, the plaintiffs could have been arrested for urinating on the plaza or for vandalizing the Plaza by causing structural damage, breaking lights, etc.

But the operative point is that no existing law prevented the plaintiffs from utilizing the Plaza for overnight free speech activities. The plaintiffs' protests contained a fundamental constitutional core, regardless of the secondary effects that resulted from the manner in which they chose to exercise it.  At any rate, the plaintiffs were not arrested because of those secondary effects, they were arrested for their *presence* on the Plaza, even though no law (the "Use Policy"

---

[24]At the Rule 12 stage, a district court in *Occupy Columbia v. Haley*, – F. Supp. 2d —, 2013 WL 496334, at \*5-\*7 (D.S.C. 2013), recently reached a similar conclusion in a case involving arrests of the "Occupy Columbia" protestors in November 2011.  The court found that, where existing regulations did not impose a curfew on protest activity on the South Carolina State House grounds, the protestors had a "clearly established right" to protest on those grounds after 6 p.m.  Given its procedural posture and the fact that the decision issued well after the October 2011 arrests at issue in this case, the *Occupy Columbia* decision is of limited relevance here.  The court merely notes that, under largely analogous circumstances (at least as alleged), another federal district court reached the same conclusion with respect to whether the protestors' rights were "clearly established" as of fall 2011.

had no legal effect) prevented them from being present there.  Thus, although the DGS *could* have regulated overnight use of the Plaza before October 2011 through validly issued reasonable time, place, and manner restrictions, it did not do so, even after being alerted to the issue nearly a year earlier.  Thus, the plaintiffs had a clearly established right to utilize the Plaza for their free speech activities, unless and until the DGS issued a valid rule governing overnight use of the Plaza.

6.      Whether the Defendants' Actions Were Objectively Reasonable.

The defendants argue that, even if they violated the plaintiffs' clearly established rights, their actions were objectively reasonable under the exigent circumstances presented.  In support of this position, they chiefly argue that (1) the situation on the Plaza required an immediate policy response; and (2) they relied on the advice of counsel – mainly DGS General Counsel Watkins – regarding the procedural and substantive reasonableness of the Use Policy.

Construing the facts in the light most favorable to the defendants, the record shows that the situation on Legislative Plaza had reached a breaking point.  The protestors and/or the homeless had already done physical damage to the Plaza and threatened to do more, including damage to the Plaza stones, to the protective membrane underneath it, and, perhaps, to the state offices below them, as well as damage to the Plaza lights.  The defendants also received potentially credible reports of violent crimes, drug use, and public lewdness.  Something needed to be done to preserve the physical integrity of the Plaza, to reduce or eliminate crime taking place there, and to alleviate the growing health and sanitation issues.

Be that as it may, the presence of a legitimate policy concern did not give the defendants *carte blanche* to respond in any manner they saw fit.  Agencies in the State of Tennessee cannot

make law by fiat: they are bound by laws, particularly the UAPA, that govern their ability to create and implement laws impacting members of the public. The UAPA prescribes that, to regulate the time, place, and manner by which the public may utilize the Plaza, the DGS must utilize rulemaking procedures or, at a minimum, utilize specific "emergency rule" procedures, both of which require consultation with the Tennessee Attorney General. The defendants did not utilize these procedures. Instead, without providing adequate notice to the public at large, they informally attempted to change the law overnight, made no record of the proceedings, and failed to consult with the Attorney General, who otherwise must pass on the constitutional validity of *any* rule (whether adopted through traditional or emergency procedures) before it becomes law.

The record does not indicate that imposing a rigid curfew by fiat was the only feasible option available to the State. The State could have (a) chosen to enforce (or requested local police authorities to enforce) existing laws against vandalism, public urination, and the like; (b) added additional security officers and provided portable toilets to the protestors, albeit at state expense; and/or (c) utilized the simple expedient of emergency rulemaking procedures under the UAPA, which would have permitted them to act, provided that the Attorney General approved of the action.[25] The defendants unreasonably chose none of these options.

The defendants argue that, notwithstanding these issues, they are nevertheless entitled to qualified immunity because they followed advice of counsel. The Sixth Circuit "has determined that reliance on counsel's legal advice constitutes a qualified immunity defense only under

---

[25]The court expresses no opinion as to whether and under what circumstances state agencies could abridge First Amendment rights pursuant to "emergency rules" without violating the United States Constitution. Had the defendants utilized the emergency rules procedure and received the required legal approval from the Attorney General, it may have presented a closer question for qualified immunity purposes.

'extraordinary circumstances,' and has never found that those circumstances were met."

*Silberstein v. City of Dayton*, 440 F.3d 306, 318 (6th Cir. 2006); *see also Ross v. City of*

*Memphis*, 423 F.3d 596, 603-604, 604 n.3 (6th Cir. 2005); *York v. Purkey*, 14 F. App'x 628, 633-

34 (6th Cir. 2001); *V-1 Oil v. State of Wyo. Dep't of Env'tl Quality*, 902 F.2d 1482, 1488 (10th

Cir. 1990) (collecting cases).  This is a narrow and exceptional defense, because "[a] reasonably

competent public official is presumed to know the law governing his or her conduct."

*Silberstein*, 440 F.3d at 318 (citing *Harlow*, 457 U.S. at 819); *York*, 14 F. App'x at 633 ("The

'extraordinary circumstances' exception applies only rarely").  While a court may consider

reliance on advice of counsel as a factor in its analysis, reliance on advice of counsel " is not

inherently extraordinary, for few things in government are more common than the receipt of

legal advice."  *York*, 14 F. App'x. (quoting *V-1*, 902 F.2d at 1488).  Thus, "reliance on legal

advice *alone* does not, in and of itself, constitute an 'extraordinary circumstance' sufficient to

prove entitlement to the exception to the general *Harlow* rule."  *Id.* (quoting *Buonocore v.*

*Harris*, 134 F.3d 245, 253 (4th Cir. 1998)).  At any rate, where a defendant argues that reliance

on legal advice constitutes an "extraordinary circumstance," the defendant bears the burden of

proving such circumstances.  *York*, 14 F. App'x at 633.

　　　　This case does not present "extraordinary circumstances" justifying the defendants'

reliance on advice of counsel.  The plaintiffs were engaging in core free speech activities, which

traditionally have only been abridged under specific circumstances subject to heightened

scrutiny by the courts in numerous published cases.  In light of the potential for significant

abridgement of those core constitutional rights by the proposed curfew and permitting

requirements, the defendants should have appreciated that abridging those rights required due

deliberation, utilization of mandated administrative procedures, consultation with the Attorney General as required for the promulgation of any rule, and, at a minimum, some sort of written record of the justification for their drastic actions. Indeed, the record contains no written memorialization (or for that matter, unequivocal testimony) as to what representations Watkins, Slatery, and/or Hutto made with respect to the legality of abridging the plaintiffs' free speech rights based on a private, unrecorded meeting. If the defendants could reasonably have acted without any formal process (which was not the case), there at least should have been some unequivocal, well-researched explanation from their counsel as to why no process was required.

From the record, it appears that the defendants essentially took the approach that, if the manner in which they created and adopted the Use Policy were made *ultra vires*, their attorneys would and should have told them. But that is not enough to make out extraordinary circumstances, because the defendants were presumptively aware of the law governing their conduct, including the UAPA and *Mandela*. Moreover, the Use Policy was, as a whole, patently unconstitutional for multiple reasons, including, *inter alia*, (1) purporting to vest unfettered discretion in the DGS to issue permits, *see Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 132-33, 112 S. Ct. 2395, 120 L. Ed. 2d 101 (1992) (permitting scheme "may not delegate overly broad discretion to a government official"); *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 756-57, 108 S. Ct. 2138, 100 L. Ed. 2d 771 (1988) ("unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship"); (2) banning "assemblies or gatherings" from utilizing the Plaza for any purpose without a permit, thereby imposing an (unconstitutional) prior restraint subject to a "heavy presumption" against its validity, *Forsyth*, 505 U.S. at 132-33; and (3) including unconstitutionally vague definitions

regarding the Use Policy's scope, including what constitutes a "gathering" or "assembly." *See Lanzetta v. New Jersey*, 306 U.S. 451, 453, 59 S. Ct. 618, 83 L. Ed. 888 (1939) ("No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes"). Indeed, the Use Policy specifically stated that permits would be issued "at the discretion of the [DGS] on a case-by-basis," which is an unequivocal delegation of precisely the type of unfettered discretion the Constitution forbids. Although the defendants are correct that the October 28 and 29 arrests only related to purported violations of the new curfew requirement, the presence of multiple unconstitutional provisions in the proposed Use Policy should have raised serious procedural and substantive constitutional concerns in the minds of the defendants, notwithstanding counsel's failure to oppose the approach undertaken. *See Harlow*, 457 U.S. at 819 ("Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, *he should be made to hesitate*; and a person who suffers injury caused by such conduct may have a cause of action.") (emphasis added).

Furthermore, the defendants have offered no coherent explanation as to why they failed to consult with the Attorney General on an issue of this magnitude, particularly where the Attorney General would be required to defend the defendants' unprecedented actions (if they could be defended). Even after the Judicial Commissioner refused to approve the warrants after the first wave of arrests, the defendants did not seek advice from the Attorney General. Generally, state agencies routinely seek opinions from the Attorney General as to whether proposed regulations constitute "rules" or "policies"; in fact, just one month before the defendants' actions here, the Attorney General had released an opinion on that precise question relative to a legal change proposed by the Tennessee Corrections Institute, which is governed by

36

a board that includes the governor or his designee.  *See* Tenn. Op. Atty. Gen. No. 11-63, 2011 WL 4907410 (Aug. 26, 2011).[26]

For these reasons, the court finds that the plaintiffs have met their burden to show that Commissioners Gibbons and Cates are not entitled to qualified immunity.

## III.    <u>The Plaintiffs' Claims</u>

Having determined that the defendants are not entitled to qualified immunity, the court next must determine whether the plaintiffs have proven (or established a genuine issue of material fact with respect to) their remaining claims.

### A.    **Claims by Malina Shannon**

Supervisory officials cannot be held liable under § 1983 on a *respondeat superior* basis. *See Rizzo v. Goode*, 423 U.S. 362, 373-77 (1976).  However, a supervisory official can be held liable if that the official at least implicitly authorized, approved, or knowingly acquiesced in the alleged unconstitutional conduct.  *Hays v. Jefferson Cnty., Ky.*, 668 F.2d 869, 874 (6th Cir. 1982); *Hicks v. Frey*, 992 F.2d 1450, 1455 (6th Cir. 1993).  The plaintiff must also establish a causal connection between the misconduct complained of and the official sued.  *Dunn v. State of Tenn.*, 697 F.2d 121, 128 (6th Cir. 1983).

Plaintiff Malina Shannon was arrested on the sidewalk.  The defendants contend, with supporting declarations, that they specifically instructed officers to arrest only protestors present on the Plaza and nowhere else.  They argue that, because the officers arrested Shannon on the

---

[26]The fact that the Attorney General consented to a restraining order (later converted to an injunction) against enforcement of the Use Policy on the day this lawsuit was filed strongly suggests that, had the Attorney General been consulted, the Use Policy never would have been implemented in the first place.  Furthermore, it is notable that the DGS ultimately utilized UAPA rulemaking procedures to adopt the Current Rules governing the Plaza.

37

sidewalk, the officers exceeded their authority when they arrested her and, therefore, the defendants cannot be held vicariously liable for her arrest. The plaintiffs have not responded to this argument and, therefore, have failed to identify facts showing that the defendants implicitly authorized, approved, or knowingly acquiesced in Shannon's arrest on the sidewalk. Therefore, the court finds that Shannon's claims will be dismissed with prejudice.

**B.     First Amendment Violation (Count I)**

The court's resolution of the qualified immunity defense essentially resolves the plaintiffs' First Amendment claims. The plaintiffs' right to engage in constitutionally protected free speech activity was violated when they were arrested (or, in Savage's case, driven to abandon the Plaza) based on a "law" that, under Tennessee statutory law, had no actual legal effect.[27]

**C.     Selective Prosecution**

"Sometimes the enforcement of an otherwise valid law can be a means of violating constitutional rights by invidious discrimination. To address this problem, courts have developed the doctrine of selective enforcement." *Gardenhire v. Schubert*, 205 F.3d 303, 318-19 (6th Cir. 2000). Selective enforcement claims are governed by the same analysis as selective prosecution claims. *See Farm Labor Organizing Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 534-35 (6th Cir. 2002). Consistent with Equal Protection standards under the Fourteenth Amendment, a plaintiff must show that the challenged enforcement action "had a discriminatory effect and that it was motivated by a discriminatory purpose." *Id* at 533-34 (quoting *Wayte v.*

---

[27]The fact that the plaintiffs did not apply for a daytime permit is irrelevant – the permit requirement, which was implemented by fiat, was void *ab initio*.

*United States*, 470 U.S. 598, 608 (1985)).  The plaintiffs must show: (1) that the official singled

out "a person belonging to an identifiable group, such as those of a particular race or religion, or

a group exercising constitutional rights, for prosecution even though he has decided not to

prosecute persons not belonging to that group in similar situations"; (2) the official "must initiate

the prosecution with a discriminatory purpose; and (3) "the prosecution must have a

discriminatory effect on the group which the [plaintiff] belongs to." *Gardenhire*, 205 F.3d at

319.  "With regard to the first element, it is an absolute requirement that the plaintiff make at a

least a *prima facie* showing that similarly situated persons outside her category were not

prosecuted." *Id.*  With regard to the discriminatory purpose element, the plaintiff must

demonstrate that the defendant "selected or reaffirmed a particular course of action at least in

part because of, not merely in spite of, its adverse effects upon an identifiable group." *Farm

Labor*, 308 F.3d at 534 (quoting *Wayte*, 470 U.S. at 610) (internal quotation marks omitted).

Determining whether official action was motivated by intentional discrimination

"demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be

available." *Village of Arlington Heights*, 429 U.S. at 266.  Furthermore, due to the strong

presumption that state actors properly discharged their official duties, a plaintiff's burden to

demonstrate discriminatory purpose and effect is a demanding one that requires "clear

evidence." *Gardenhire*, 205 F.3d at 319.  If a plaintiff satisfies his or her burden to show both

discriminatory purpose and discriminatory effect, the burden shifts to the defendant to

demonstrate that "the same enforcement decision would have been made even if the improper

purpose or classification had not been considered." *Farm Labor.*, 308 F.3d at 539 (quoting

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)).

39

Here, the plaintiffs have not met their burden to show selective prosecution. First, although the DGS permitted TPAC patrons to utilize the Plaza as a means of egress from the TPAC, those patrons were not similarly situated to the plaintiffs. The Occupy Nashville protestors refused to vacate the Plaza after being notified to do so on pain of arrest. There is no indication in the records that anyone other than the protestors was utilizing the Plaza at the time those warnings were issued on either night. Thus, they have not met their "absolute" *prima facie* requirement.

Second, even if they had met that requirement, the record contains no indication that the defendants acted with a discriminatory purpose. For example, the record contains no testimony that the defendants sought to target Occupy Nashville for special treatment because of its message; instead, the defendants imposed (albeit illegally) a curfew requirement designed to address pressing policy concerns, including the integrity of the Plaza and growing health and safety concerns. The record demonstrates that the defendants took action *in spite of* the plaintiffs' constitutional rights, not because of them.

Finally, even if the plaintiffs could meet their initial burden, the defendants have shown that they would have attempted to impose a curfew regardless of the plaintiffs' free speech activities. That is, if a group other than Occupy Nashville had "occupied" the Plaza to engage in activity unrelated to free speech resulting in the same attendant safety and sanitation issues, the record indicates that the defendants similarly would have attempted to impose a curfew to alleviate the negative consequences of that occupation (crime, sanitation, etc.).

### D. Due Process

The plaintiffs were arrested while engaging in a peaceful protest on the Plaza or deterred

from engaging in such protest activities. As detailed above, the defendants did not follow necessary administrative procedures in adopting and enforcing the Use Policy, meaning that the law under which the plaintiffs were arrested was void when the State adopted and enforced it by fiat. Therefore, the plaintiffs have shown that they were deprived, without due process, of their liberty to be free from unlawful arrest and of their liberty to engage in free speech activity. *Jackson v. City of Columbus*, 194 F.3d at 749.

### F. Unlawful Arrest

To arrest an individual based on "probable cause," an arresting officer must have probable cause to believe that the arrestee has committed or is committing a crime. *United States v. Pearce*, 531 F.3d 374, 380 (6th Cir. 2008). To state a claim for false arrest, a plaintiff must show that the defendant lacked probable cause for such an arrest. *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010). The arresting officer's actual motivations are irrelevant to the probable cause analysis. *Criss v. City of Kent*, 867 F.2d 259, 262 (6th Cir. 1988).

There can be little dispute that the plaintiffs' arrests (other than Savage, who was not arrested) were unlawful. The Use Policy never had any legal effect, yet Commissioner Cates and Commissioner Gibbons implemented it and directed that the plaintiffs be arrested for violating it. Under the existing state of the law, the plaintiffs were not engaging in criminal conduct simply by being present on the Plaza,[28] which was the conduct for which they were arrested. Therefore, with the exception of plaintiffs Shannon and Savage, the court will grant judgment to the

---

[28]Again, the secondary effects of the occupation, some of which were already criminalized, are a different story. For example, although the plaintiffs had a right to maintain an overnight protest on the Plaza, they did not have a right to defecate on it, to destroy it physically, to engage in lewd public acts, to assault people, or to sell drugs.

plaintiffs on this claim.

      **E.**      **First Amendment Retaliation**

"Retaliation for the exercise of constitutional rights is itself a violation of the Constitution." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). To show a claim of retaliation for exercising constitutional rights, a plaintiff must show that: (1) the plaintiff engaged in constitutionally protected activity; (2) the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights. *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998). "[E]ach step of the analysis is flexible enough to take into account the various contexts in which retaliation claims might be made." *Thaddeus-X*, 175 F.3d at 395. With respect to the third element, "[w]hen assessing motive in the context of a summary judgment motion, bare allegations of malice do not suffice to establish a constitutional claim." *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010). However, "[c]ircumstantial evidence, like the timing of events or the disparate treatment of similarly situated individuals, is appropriate." *Id.* Temporal proximity, standing alone, is insufficient to establish a causal connection. *Id.*

      The plaintiff must demonstrate that the speech at issue was a substantial or motivating factor in the adverse action. *Id.* A motivating factor is essentially but-for cause – "without which the action being challenged simply would not have been taken." *Id.* (quoting *Leonard v. Robinson*, 477 F.3d 347, 355 (6th Cir. 2007)). The court must utilize a burden-shifting analysis for this part of the claim: once the plaintiff has met his burden of establishing that his protected conduct was a motivating factor behind any harm, the burden of production shifts to the

42

defendant.  *Vereecke*, 609 F.3d at 400.  If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment.  *Id.*

As with the selective enforcement claim, the plaintiffs have not demonstrated that their speech activities, as such, motivated the defendants' adverse actions.  The uncontroverted evidence establishes that the Use Policy was intended to alleviate the negative secondary effects of the plaintiffs' continued overnight use of the Plaza, not to retaliate against members of Occupy Nashville for protesting against the government or to effectuate some other unlawful purpose.  Indeed, the State appeared prepared to allow the plaintiffs to utilize the Plaza for free speech activities during the daylight hours.  Thus, the defendants are entitled to summary judgment on the plaintiffs' retaliation claims.

### F.  Summary

The First Amendment cannot yield to the enforcement of state regulations that have no legal effect.  The defendants had a number of options to respond to the legitimate policy issues created by Occupy Nashville's continued occupation of the Plaza.  In choosing to adopt and implement new regulations by fiat without seeking necessary approval from the Attorney General, they made an unreasonable choice that violated the plaintiffs' constitutional rights in multiple respects.  Had the defendants utilized the appropriate procedures – particularly consultation with the Attorney General – the court is confident that the "Use Policy," which was facially unconstitutional in multiple respects and which had no legal effect, would never have been enforced in the first place.

At the same time, although the defendants made an unreasonable decision, the record

does not indicate that they did so maliciously or with some invidious discriminatory intent. For that reason, Commissioners Cates and Gibbons are entitled to summary judgment on the selective prosecution and retaliation claims.

## CONCLUSION

For the reasons stated herein, the court finds as follows:

- The plaintiffs' Motion for Summary Judgment will be granted in part and denied in part, and the defendants' Motion for Summary Judgment will be granted in part and denied in part.

- Commissioner Cates and Commissioner Gibbons are not entitled to qualified immunity against the plaintiffs' personal capacity claims. This finding is not relevant to Governor Haslam, against whom the plaintiffs did not assert individual capacity claims.

- The following claims will be dismissed with prejudice against all defendants: (1) claims against the "John Doe" defendants; (2) claims under the Fifth Amendment; (3) claims under the Tennessee Constitution and the UAPA (Counts III, IV, and VI)); (3) the selective enforcement claim (Count II), (4) the unlawful seizure of personal property claim (Count VII); (4) the retaliation claim (Count IX); (5) individual capacity claims by plaintiff Malina Shannon; and (6) the claims by plaintiff Katy Savage for false arrest.

- With respect to the issue of liability, the court will grant judgment to all plaintiffs other than Shannon as to Counts I and V, and judgment as to all plaintiffs other than Shannon and Savage as to Count VIII. The court also finds that the plaintiffs have prevailed on their demands for injunctive relief against Governor Haslam, Commissioner Cates, and Commissioner Gibbons, although no further relief from the court is necessary with respect thereto.

- The court expressly reserves judgment on the issue of damages, including whether and in what amounts awards of attorney's fees under § 1988 may be appropriate with respect to (a) the successful official capacity claims against Governor Haslam, Commissioner Cates, and Commissioner Gibbons, and/or (b) the successful individual capacity claims against Commissioner Cates and Commissioner Gibbons. As set forth in the accompanying Order, the parties will be required to provide the court with a joint statement by July 1, 2013 as to whether the parties will require

44

further briefing and/or an evidentiary hearing to resolve damages and fees.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

45