| | | |
|---|---|---|
| **OCCUPY NASHVILLE, PAULA ELAINE PAINTER, MALINA CHAVEZ SHANNON, LAUREN MARIE PLUMMER, ADAM KENNETH KNIGHT, WILLIAM W. HOWELL, DARRIA HUDSON, and KATY SAVAGE,** | ) ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | **Case No. 3:11-cv-01037** **Judge Aleta A. Trauger** |
| **v.** | ) ) | |
| **WILLIAM EDWARD ("BILL") HASLAM, GOVERNOR OF THE STATE OF TENNESSEE, WILLIAM L. GIBBONS, COMMISSIONER OF THE TENNESSEE DEPARTMENT OF GENERAL SAFETY, STEVEN G. CATES, COMMISSIONER OF THE TENNESSEE DEPARTMENT OF GENERAL SERVICES, and TENNESSEE HIGHWAY PATROL OFFICERS DOES 1-210,** | ) ) ) ) ) ) ) ) ) ) ) | |
| **Defendants.** | ) | |

## MEMORANDUM

The plaintiffs have filed a Motion for Attorney Fees, Costs, and Expenses (Docket No. 100), to which the defendants filed a Response in opposition (Docket No. 105), and the plaintiffs filed a Reply (Docket No. 107). For the reasons stated herein, the motion will be granted and the court will award the plaintiffs $35,075 in fees relating to their official capacity claims only.

## BACKGROUND

This court and the Sixth Circuit on appeal have detailed the facts and procedural circumstances of this case in previous opinions, familiarity with which is assumed. (Docket Nos. 88 and 92.) Briefly, this case concerned the government's October 2011 response to the

"Occupy Nashville" protests on state property located in Nashville, Tennessee, including the mass arrests and attempted detention of protesters on successive nights.

## I.   The Arrests, the Verified Complaint, and the TRO

As detailed in the court's earlier opinion, the incidents at issue began when, without utilizing available administrative procedures and notice provisions, Governor Haslam's administration unilaterally changed the rules (the "Old Policy") governing use of Legislative Plaza effective October 27, 2011. The change was made in response to the ongoing Occupy Nashville protests and was, by all accounts, designed to eliminate the protesters' overnight occupation of the Plaza, among other things. On the morning of October 28, 2011, law enforcement officers enforced the new policy (the "Use Policy") and arrested all of the protesters who refused to leave the Plaza, thereby ending the demonstration.[1] After the Night Court judge refused to hear the charges, officers released the protesters several hours later. Many of those protesters (among other people) returned to protest on the Plaza again the next day. Shortly after midnight, law enforcement officers again arrested protesters who refused to leave the Plaza, and the Night Court judge again ordered that the government release them.

On the morning of Monday, October 31, 2011 – the first court day after the second round of arrests under the Use Policy – the plaintiffs filed a Verified Complaint (Docket No. 1) and an accompanying Motion for Temporary Restraining Order (Docket No. 9). In the Verified

---

[1] The parties disputed whether the Use Policy constituted a "policy" or a "rule" under the Tennessee Administrative Procedures Act ("TAPA"). The court concluded that the enactment was a "rule" that should have been promulgated under TAPA. On appeal, the Sixth Circuit stated that it was unnecessary to address whether this court's conclusion was correct but referred to the enactment as a "Use Policy" for ease of reference. The court will similarly refer to it as the "Use Policy," although the court continues to regard it as a "rule" subject to TAPA rulemaking procedures.

Complaint, the plaintiffs asserted claims against Tennessee Governor Bill Haslam, Commissioner of the Tennessee Department of Safety Williams L. Gibbons, and Commissioner of the Tennessee Department of General Services Steven G. Cates, including state and federal constitutional claims relating to violations of the plaintiffs' rights to free speech, freedom of assembly, freedom from unlawful search and seizure of property, and freedom from unlawful arrest. The Verified Complaint, which was supported by affidavits from seven named plaintiffs, sought a declaration that the Use Policy was unenforceable, an injunction against continued enforcement of the Use Policy, the return of all seized items, monetary damages for unlawful detention, and attorney's fees and costs under 42 U.S.C. § 1988. In the Motion for Temporary Restraining Order, the plaintiffs asked the court immediately to enjoin enforcement of the Use Policy.

That afternoon, the court held a hearing concerning the request for injunctive relief. In advance of the hearing, the parties submitted a joint proposed Temporary Restraining Order against enforcement of the Use Policy. At the hearing, the court indicated that it would enter the proposed order. The court also stated on the record that it would have granted temporary relief in any case, because (1) the Use Policy constituted a set of "rules" that should have been, but were not, promulgated under the Tennessee Administrative Procedures Act, (2) the Legislative Plaza was a "quintessential public forum," and (3) the Use Policy imposed a "clear prior restraint of free speech rights." (Docket No. 13 at 3:1-13.) The court also expressed that it was "gratified and not too surprised . . . that the State is taking the position that it's taking[.]" (*Id.* at 3:14-17.) Following the hearing, the court entered the joint proposed Temporary Restraining Order (Docket No. 11), which enjoined the defendants from enforcing the Use Policy, did not require the plaintiffs to post a bond, and otherwise permitted the government to enforce existing valid

criminal and civil laws. With the parties' agreement, the court set a hearing to convert the TRO to a preliminary injunction for November 21, 2011. (*Id.*)

## II. **The Preliminary Injunction**

On November 16, 2011 (five days before the hearing date), the parties filed a joint proposed Agreed Order Establishing Preliminary Injunction. (Docket No. 14.) On November 17, 2011, the court entered the agreed order (hereinafter, the "Preliminary Injunction"), which (1) converted the TRO into a preliminary injunction, (2) enjoined the defendants from enforcing the Use Policy against the plaintiffs and against anyone else, pending further order of the court, and (3) permitted the injunction to remain unsecured. The order also stated that the preliminary injunction "shall remain in effect until such time as the Court specifically orders otherwise," that it did not preclude either party from moving to modify the injunction or to move for permanent injunctive relief, and that it did not preclude the government from subsequent rulemaking concerning the use of the Plaza and the other public forums at issue (the War Memorial and the Capitol Grounds). In a June 12, 2013 opinion, this court stated that, "[i]n essence, the Preliminary Injunction converted the TRO into an indefinite injunction against enforcement of the Use Policy without a bond requirement." (Docket No. 88 at p. 4.) As the Sixth Circuit later agreed on appeal, effective November 17, 2011, the Use Policy was no longer in effect.

## III. **The Amended Complaint, Settlement Discussions, and Rule Changes**

On January 5, 2012, the plaintiffs filed an Amended Complaint that added class claims, claims against unnamed "John Doe" officers, and a First Amendment retaliation claim. The

Amended Complaint otherwise included substantially the same official capacity claims as the Verified Complaint.[2]

On February 3, 2012, the court held an initial case management conference, at which the defendants informed the court that the legislature was working on a law that would address the ongoing protests on the Plaza. In the parties' proposed case management order (Docket No. 21), the defendants took the position that the plaintiffs should not be entitled "to any *further* injunctive relief, declaratory relief, or money damages." (Docket No. 21 at p. 2 (emphasis added).) By agreement, the parties also asked the court to stay the case to permit them to conduct judicially supervised settlement discussions. On February 6, 2012, the court entered an Order referring the case to Magistrate Judge Brown to oversee settlement discussions. (Docket No. 22.) Despite multiple conferences with the Magistrate Judge (Docket Nos. 23, 25, 26, 27, and 28), the parties were unable to reach a settlement.

While the stay was in place and the parties were attempting to negotiate a settlement, the court's understanding is that (1) the uninterrupted "occupation" of the Plaza continued, and (2) the State of Tennessee attempted to revise the laws (using appropriate procedures) to forbid continuous occupation of the Plaza. In March 2012, Tennessee enacted a statute that banned camping on state-owned land not designated for that purpose. On April 27, 2012, the Department of General Services withdrew the Use Policy entirely and replaced it with a different set of rules (the "Current Rules"), which became effective November 20, 2012. *See* Tenn. Comp. R. &. Regs. 0690-06-01-.01 to .04.

On April 11, 2012, in light of the failure of the parties' settlement discussions, the district court withdrew the referral to the Magistrate Judge and set a case management conference to

_____

[2] The plaintiffs never pursued the class action claims or the John Doe claims.

take place in May 2012.  (Docket No. 29.)  After a conference on May 21, 2012, the court

entered a Case Management Order in substantially the same form as the earlier proposed order

(resetting the deadlines accordingly).  (Docket No. 37.)

## IV.  <u>Rule 56 Motions and the Defendants' Appeal of Money Damages Ruling</u>

The parties continued to litigate the money damages claims.  In March 2013, following

discovery, the parties filed cross-motions for summary judgment (Docket Nos. 67 (defendants)

and 72 (plaintiffs).)  On June 12, 2013, the court granted the motions in part and denied them in

part.  (Docket No. 89.)

In the court's opinion on the summary judgment motions, the court rejected the

defendants' contention that the plaintiffs had "abandoned" their demand for injunctive relief,

finding that the plaintiffs had "already prevailed on their demand for injunctive relief against

enforcement of the Use Policy."  (Docket No. 88 at p. 14.)  The court stated that "the plaintiffs

do not presently need declaratory or injunctive relief because they already successfully opposed

enforcement of the Use Policy, which the DGS rescinded in April 2012 and formally replaced

with the Current Rules on November 20, 2012."  (*Id*.)  In a footnote, the court also indicated that,

"if the defendants had continued to seek to enforce the Use Policy through the present date, the

court undoubtedly would have issued a declaratory judgment that the Use Policy was not a valid

law and that it would have been unconstitutional to enforce it in any respect."  (*Id.* at p. 15 n.13.)

The court further stated that "only claims seeking money damages relief remain for the court's

resolution at this stage" and that, "[p]ut another way, the plaintiffs have already prevailed on

their official capacity claims and now seek money damages against the defendants in their

individual capacities."  (*Id.*)  In two footnotes, the court presaged the motion at issue, noting that

the parties' briefs did not address the issue of whether plaintiffs would seek to recover either

punitive damages or attorney's fees "with respect to their successful claims for injunctive relief, let alone what fees would reasonably be attributable to those claims." (*Id.* at p. 15 n.13; *see also id.* at p. 17 n.16.)

As to the money damages claims, the court found that that the plaintiffs' constitutional rights were violated and that Commissioners Cates and Gibbons were not entitled to qualified immunity as to three of the plaintiffs' claims. The court therefore granted judgment to the plaintiffs on liability. In its Order on the motions, the court accordingly held, in most relevant part, that (1) Commissioners Cates and Gibbons were personally liable to certain plaintiffs on three claims, and (2) with respect to the official capacity claims, "[a]lthough no further equitable relief is required from the court, the plaintiffs have prevailed on their official capacity claims against Governor Haslam, Commissioner Cates, and Commissioner Gibbons." (Docket No. 89 (emphasis added).) The Order also set a deadline for the parties to submit a joint statement as to whether any further proceedings would be necessary relative to damages and fee-shifting.

On June 27, 2013, before the joint statement deadline concerning damages and fees, Gibbons and Cates filed an interlocutory appeal of the court's ruling denying qualified immunity and its related findings in favor of the plaintiffs concerning the individual capacity claims against Cates and Gibbons. (Docket No. 90.) On October 8, 2014, the Sixth Circuit reversed, finding that Gibbons and Cates were entitled to qualified immunity (Docket No. 92). The Sixth Circuit held that Cates and Gibbons were entitled to qualified immunity because the constitutional right at issue – the right to "indefinite occupation of a public park" – was not clearly established by Supreme Court precedent. *See Occupy Nashville v. Haslam*, 769 F.3d 434 (6th Cir. 2014). The Sixth Circuit's opinion explicitly did not analyze whether a constitutional violation had occurred in the first place. The Sixth Circuit also took no position on whether the district court had

correctly concluded that (1) the Use Policy had been implemented in derogation of the TAPA and (2) the failure to comply with TAPA contributed to the asserted constitutional violations.[3]

On remand, the district court vacated the June 12, 2013 judgment against Gibbons and Cates only as it related to the individual capacity claims. (Docket No. 94.)

## V. **Motion for Fees**

On January 15, 2015, the plaintiffs filed the instant Motion for Fees (Docket No. 100), in support of which they filed a Memorandum of Law (Docket No. 101) and declarations from three attorneys who worked on the case. (Docket Nos. 102 (Declaration of C. David Briley), 103 (Declaration of Tricia Herzfeld), and 104 (Declaration of Patrick Frogge).) The defendants filed a Response in opposition (Docket No. 105), which attached the Declaration of Dawn Jordan (*id.*, Attach. No. 1.) The plaintiffs filed a Reply (Docket No. 107), in support of which they filed declarations from two outside attorneys concerning the reasonableness of the fees requested by Ms. Herzfeld, Mr. Briley, and Mr. Frogge. (Docket Nos. 108 (Declaration of William L. Harbison) and 109 (Declaration of Kyle Mothershead).)

## ANALYSIS

## I. **Are the Plaintiffs "Prevailing Parties" under § 1988?**

### A. **Legal Standard**

Under § 1988(b), "the court, in its discretion, may award the prevailing party . . . a reasonable attorney's fee as part of the costs[.]" As construed by the Supreme Court, the

_____

[3] Because Commissioner Gibbons is the husband of Sixth Circuit Judge Julia Gibbons, all of the Sixth Circuit judges recused themselves from hearing the appeal. The Committee on Intercircuit Assignments of the Judicial Conference of the United States assigned a special panel of three judges from other circuits to hear the appeal. Under the circumstances, the panel understandably proceeded with caution as "guests of the Sixth Circuit" (769 F.3d at 444 n.19), limiting its findings only to those necessary to resolve the appeal.

statutory presumption is that the court "must" award fees to "prevailing" plaintiffs. *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983). In *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 602 (2001), the Supreme Court observed that a party can "prevail" by receiving a judgment on the merits or by entering into a settlement agreement made enforceable through a consent decree. *Buckhannon* did not address whether a plaintiff may also "prevail" under other circumstances, such as prevailing on a Rule 65 motion for injunctive relief. In *Sole v. Wyner*, 551 U.S. 74, 86 (2007), the Court held that a plaintiff does not establish prevailing party status if a preliminary injunction is later "reversed, dissolved, or otherwise undone by the final decision in the same case," because § 1988 requires lasting relief, not the temporary, "fleeting success" that the injunction represented in that case. *Sole* explicitly left open "whether, in the absence of a final decision on the merits . . . , success in gaining a preliminary injunction may sometimes warrant an award of counsel fees." *Id.* at 86.

Although neither party references the case here, in *McQueary v. Conway*, 614 F.3d 591 (6th Cir. 2010), the Sixth Circuit explicitly addressed the issue left open in *Buckhannon* and *Sole*. In *McQueary*, the plaintiff challenged the constitutional validity of a Kentucky law that limited his ability to protest at military funerals, claiming that the law violated his rights under the First and the Fourteenth Amendments. *Id.* at 595. Upon motion by the plaintiff, the court preliminarily enjoined Kentucky from enforcing two subsections of the law. *Id.* at 596. Six months later, the Kentucky legislature repealed these two subsections, and the court consequently dismissed the action as moot. *Id.* The district court denied McQueary's request for fees under § 1988. *Id.* On appeal, the Sixth Circuit considered the specific question of "whether or when the winner of a preliminary injunction may be treated as a 'prevailing party' entitled to attorney's fees" under § 1988. *Id.* at 596.

9

The Sixth Circuit reasoned from basic principles. First, it observed that, "to be a prevailing party, the plaintiff must obtain a material change in the legal relationship between himself and the defendant," which change must "directly benefit the plaintiff by modifying the defendant's behavior toward him," as opposed to a "symbolic victory" that is not compensable. *Id.* at 598 (internal brackets and citations omitted). Second, § 1988 is designed to award fees to deserving parties, not to generate satellite litigation over fees. *Id.* at 598. Turning to the possible rules for fee-shifting as it relates to injunctive relief, the Sixth Circuit explicitly rejected a bright-line rule that procuring injunctive relief alone *never* suffices under § 1988.

> [T]his approach fails to account for fact patterns in which the claimant receives everything it asked for in the lawsuit, and all that moots the case is court-ordered success and the passage of time. When protesters seek an injunction to exercise their First Amendment rights at a specific time and place—say to demonstrate at a Saturday parade—a preliminary injunction will give them all the court-ordered relief they need and the end of the parade will moot the case. In what way are such claimants not prevailing parties? We think that they are. The same is true of a government employee who seeks to exclude an unconstitutionally obtained report from an administrative hearing and obtains a preliminary injunction that irrevocably excludes the report.

> Not all preliminary injunctions, as these examples show, have merely a catalytic effect. The defendants in these cases did not voluntarily change their conduct. An immediately enforceable preliminary injunction compelled them to. And in each instance, the plaintiffs obtained all of the relief they requested once the preliminary injunction served its purpose.

> The plaintiffs in all of these cases, it is true, might have avoided the "preliminary" label attached to their victories by asking the courts to convert their motions for a preliminary injunction into motions for a final injunction. *See* Fed. R. Civ. P. 65(a)(2). Yet Rule 65 is not the Rosetta Stone to prevailing-party inquiries. A district court may, but it does not have to, grant Rule 65 requests, and nothing about the nature of the prevailing party inquiry suggests that it should turn on whether a district court happens to embrace this administrative streamlining device. In the final analysis, the *preliminary* nature of the relief does not by itself provide a ground for *never* granting fees.

*Id.* at 599 (citations omitted). The court also rejected a *per se* rule that preliminary injunction winners *always* are eligible for fees, given that "[s]ome preliminary injunctions have nothing to do with the merits, offering no insight into whether one party or the other will prevail at the end of the case," such as "stay-put or status quo injunctions" that "turn more on the graveness of irreparable harm to one party or to the public interest than on the legal virtues of the parties' positions." *Id.* at 600.

In light of these considerations, the Sixth Circuit indicated that, in determining whether to award fees to a preliminary injunction winner, a district court should make a "contextual and case-specific inquiry." *Id.* at 601. The Sixth Circuit also cautioned that, "[i]n the aftermath of *Buckhannon* and *Sole*, however, we can say that the 'preliminary' nature of the relief together with the requirement that a prevailing-party victory must create a lasting change in the legal relationship between the parties and not merely 'catalyze' the defendant to voluntary action—will generally counsel against fees in the context of preliminary injunctions." *Id.*

Turning to the case before it, the Sixth Circuit rejected the district court's justifications for denying fees to the plaintiff. The Sixth Circuit found that McQueary had directly benefited from the preliminary injunction, which permitted him to protest at military funerals without fear of prosecution under the challenged Kentucky laws. *Id.* at 601-02. The Sixth Circuit also found that it made no difference whether the plaintiff prevailed on a facial challenge (overbreadth) or on an "as-applied" challenge. *Id.* at 602. As the court observed, one of the justifications for § 1988 is that it allows individual citizens to act as private attorneys general, "making it odd to say that the litigant who truly acts on behalf of other citizens by bringing an overbreadth challenge is *not* entitled to fees." *Id.* Despite these findings, the Sixth Circuit held that the question of whether McQueary should collect fees was for the district court in the first instance:

That question is for the district court, which had a ring-side view of the underlying proceedings, which is in the best position to make an initial cut at whether [the plaintiff] deserves fees for this preliminary injunction and which is given considerable deference over most aspects of the fees inquiry. *Buckhannon*, *Sole*, and *Dubuc* make clear, we think, that, when a claimant wins a preliminary injunction and nothing more, that usually will not suffice to obtain fees under § 1988. What remains unclear is when the occasional exceptions to that rule should apply, a contextual and case-specific inquiry that we ask the district court to undertake in the first instance.

*Id.* at 604.[4]

## B. Application

The State argues that the April 2012 withdrawal of the Use Policy foreclosed the plaintiffs from recovering fees on their official capacity claims.

As the court stated multiple times in its June 2013 opinion, the court viewed (and continues to view) the plaintiffs as having prevailed on their official capacity claims. The state jointly agreed to the TRO and jointly agreed to the Preliminary Injunction, which effectively converted the TRO into an indefinite injunction. Not surprisingly, the government never

---

[4] Incidentally, the district court on remand again held that the plaintiff was not entitled to fees, *See McQueary v. Conway*, 2012 WL 3149344 (E.D. Ky. Aug. 1, 2012). That decision is distinguishable for multiple reasons. First, the district court construed the Sixth Circuit decision as precluding relief except where, after the passage of a defined event, a preliminary injunction can no longer be revoked. Here, as explained herein, the court does not read the initial Sixth Circuit decision in *McQueary* so narrowly. Second, in *McQueary*, it does not appear that the plaintiff sought to protest at a specific place at a specific point in time; he sought the right to protest at military funerals in general, whenever they may have occurred in the future. By contrast, as explained in the next section of this court's opinion, the Occupy Nashville protesters sought and obtained immediate relief to protest at a specific place (the Legislative Plaza) at a specific point in time (*i.e.*, to continue their *ongoing* protests into November 2011 and thereafter). At any rate, reviewing only for "clear error," the Sixth Court held in an unpublished *per curiam* opinion that the district court's decision to deny fees to McQueary was not clearly erroneous. *McQueary v. Conway*, 508 F. App'x 522 (6th Cir. 2012). For all of these reasons, the later proceedings in *McQueary* do not dictate a result in favor of the defendants here.

indicated to the court or to the plaintiffs that it would seek to challenge the preliminary injunction. Indeed, as the court expressed at the initial TRO hearing and again in its June 2013 opinion, it believed that the Use Policy was patently unconstitutional and unenforceable, it viewed the plaintiffs' official capacity claims as meritorious, and it "undoubtedly" would have made the injunction permanent or entered judgment for the plaintiffs if they had sought judgment before the Use Policy was rescinded in April 2012.

The TRO and the Preliminary Injunction directly benefitted the plaintiffs and the other protesters, who resumed the protests without fear of arrest. The possibility of arrest was not an idle threat: on two successive nights preceding this lawsuit, law enforcement officers arrested numerous protesters, removed them from the Plaza, charged them with crimes, and temporarily detained them. Had the plaintiffs not sought and obtained relief from the court, the government presumably would have continued to arrest the plaintiffs and other protesters on the Plaza who defied the Use Policy. The entry of injunctive relief by the court (through the TRO and the Preliminary Injunction) gave the plaintiffs the immediate relief that they sought: the right to continue protesting on Legislative Plaza. Indeed, it appears that they continued their protests for months thereafter, until the government passed a new law in the Spring of 2012.

The court interprets the Sixth Circuit's well-reasoned opinion in *McQueary* to stand for the proposition that, in evaluating whether a plaintiff who obtains Rule 65 relief should be considered a "prevailing party," the court should not elevate form over substance. Here, it would be the epitome of form over substance to conclude that the protesters did not "prevail" on their official capacity claims. The defendants *agreed* to enjoin enforcement of the Use Policy in response to this lawsuit, and the court at the TRO hearing and again in its June 2013 opinion

made clear that the official capacity claims were meritorious. The relief entered by the court was "preliminary" in name but not in substance.

The plaintiffs cannot be faulted for not seeking permanent or dispositive relief before April 2012. First, as a procedural matter, the court requires parties to request leave before moving for interim dispositive relief, and the court generally does *not* allow early motions for partial summary judgment, absent special circumstances. Indeed, in this case, the court denied the defendants' pre-discovery request for leave to file a motion for partial summary judgment. (*See* Docket No. 36.) Second, by agreement with the defendants, the plaintiffs agreed to stay the case to discuss settlement between February 2012 and April 2012. Under the circumstances, it would be unfair to hold it against the plaintiffs that they declined to move for permanent relief or for an early judgment on the official capacity claims where (1) there was no need to do so (the government effectively conceded injunctive relief was appropriate and would continue indefinitely), (2) the court's merits decision on the official capacity claims was a *fait accompli*, (3) the parties were attempting to reach a settlement without the further expense of time and resources, and (4) for purposes of judicial economy and procedural fairness, the district court generally discourages parties from filing early Rule 56 motions.

More broadly, denying fees here would not serve the policy interests behind § 1988, which is designed to permit parties who bring meritorious constitutional claims to recover their attorney's fees. The statute empowers individuals to enforce their constitutional rights and to prevent enforcement of unconstitutional laws, regardless of whether they can pay for an attorney out-of-pocket. The statute also incentivizes quality attorneys (such as the plaintiffs' attorneys here) to take on meritorious constitutional cases. Here, those interests would be violated if the

court refused to grant the plaintiffs any fees relative to the official capacity claims on which they prevailed.

The plaintiffs contend that they should receive their fees through April 2012, when the Use Policy was revoked. However, the court agrees with the defendants that the plaintiffs should not receive fees for work performed after November 17, 2011, the date on which the court entered the Preliminary Injunction. The plaintiffs have not shown – nor do the billing records reflect – that work performed after that date was specific to the terms of the Preliminary Injunction or the substance of the official capacity claims.

For these contextual and case-specific reasons, the court finds that the plaintiffs prevailed on their official capacity claims for purposes of § 1988 and that the plaintiffs are entitled to their reasonable fees and expenses through November 17, 2011, to the extent that those fees are reasonably attributable to the official capacity claims.

## II. Calculation of Fees

### A. Legal Standard

The party seeking an attorney's fee award pursuant to a statute has two main obligations: (1) to provide the court with "evidence supporting the hours worked and rates claimed" and (2) to demonstrate that the requested fee award is "reasonable." *Building Service Local 47 v. Grandview Raceway,* 46 F.3d 1392, 1402 (6th Cir. 1995); *U.S. Structures v. J.P. Structures,* 130 F.3d 1185, 1193 (6th Cir. 1997). Here, the plaintiffs have provided declarations that attach itemized time records and task descriptions for the attorneys (and their associated support staff) who performed work for the plaintiffs in this case. These records provide the court "evidence supporting the hours worked and rates claimed." The remaining question is whether, in light of all of the circumstances of this case, the fee award sought is "reasonable."

The starting point for determining the reasonableness of a requested fee is the "lodestar" analysis, whereby the requested fee is compared with the amount generated by multiplying the number of hours reasonably worked on the litigation by the reasonable hourly rate. *U.S. Structures,* 130 F.3d at 1193. A reasonable hourly rate is determined by considering the skill, experience, and reputation of the attorneys involved and the market in which they practice. *Adcock–Ladd v. Sec'y of Treasury,* 227 F.3d 343, 350 (6th Cir. 2000). If the requested fee is essentially in line with the "lodestar," then there is a strong presumption that the requested fee is reasonable and recoverable. *Id.*

In addition to the lodestar analysis, the court should also consider any relevant *"Johnson"* factors and whether some adjustment to the award is required under those factors. *See Reed v. Rhodes,* 179 F.3d 453, 471 (6th Cir. 1999) (*citing Johnson v. Ga. Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974)). These factors are: (1) the time and labor required by a given case; (2) the novelty and difficulty of the questions presented; (3) the skill needed to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Id.* The Sixth Circuit has recognized that, often, these factors are naturally blended into the reasonableness analysis. *Paschal v. Flagstar Bank,* 297 F.3d 431, 435 (6th Cir. 2002).

**B. Lodestar Analysis**

    1. <u>The Attorneys and Their Respective Billing Rates</u>

Attorney Briley requests $395 per hour for his services.  Mr. Briley has worked for thirteen years at the law firm of Bone McAlester Norton PLLC, handling a variety of civil litigation matters including corporate litigation, general civil litigation, personal injury, workers compensation and class action litigation.  He represents that the rates billed in this case are those billed to paying clients for the work performed.  His affidavit attaches itemized billing records that reflect the date of each task, the work performed, the hours spent on each task, and the total billed amount.  His billing records reflect 55.65 hours of work performed through November 17, 2011.[5]

Attorney Patrick Frogge is a partner at the law firm of Bell, Tennent & Frogge.  He has practiced law for fourteen years, including two years as judicial clerk, two years as a staff attorney for the Metro Nashville Public Defender's Office, two years as a solo practitioner, and the past eight years at his current firm.  Although his primary practice is criminal law, he has handled "numerous" civil rights cases in state and federal court.[6]  His affidavit attaches itemized billing records that reflect the work performed on particular dates and the hours expended on each task.  The records reflect 38 hours billed through November 17, 2011.  He seeks $300 per hour for his time spent on the case.

---

[5] A paralegal also performed work on the case at a rate of $150 per hour.  However, all of the paralegal time entries are for tasks performed after November 17, 2011, so the court need not make findings as to the reasonableness of this rate or the time expended.

[6] Although not referenced by Frogge in his affidavit, a review of this court's docket validates Frogge's assertion that he has handled several civil rights cases.  *See, e.g., Keeton v. Metro Gov't of Nashville, Davidson Cnty.*, No. 3:06-cv-0431 (M.D. Tenn. removed April 28, 2006); *Bilyeu v. Metro Gov't of Nashvlle/Davidson Cnty.*, Docket No. 3:06-cv-0718 (M.D. Tenn. removed July 25, 2006); and *Simpson v. Metro Gov't of Nashville & Davidson Cnty.*, No. 3:08-cv-0089 (M.D. Tenn. removed Jan. 28, 2008).

Attorney Tricia Herzfeld has practiced law for 13 years, including three years as an assistant public defender in the Miami Defenders Office, two years handling mainly insurance defense claims at a law firm in West Virginia, five years litigating constitutional matters as a staff attorney and Legal Director for the ACLU Foundation of Tennessee, and most recently as a Senior Counsel at Ozment Law. She seeks $350 per hour for her time and $105 per hour for time spent by Paralegals.[7] Her declaration attaches itemized billing records reflecting the tasks performed on a given date and the person performing the task. Her billing records reflect 42.1 hours expended by Ms. Herzfeld through November 17, 2011 and 5.0 hours expended by a paralegal. Many of the entries appear to be 0.1 hour entries for sending and receiving emails.

Attorneys Bill Harbison and Kyle Mothershead, both of whom are well known to the court, have filed affidavits attesting to the reasonableness of the rates sought by Briley, Frogge, and Herzfeld. Harbison's Declaration is especially persuasive, as Mr. Harbison is the current President of the Tennessee Bar Association, a member of the Tennessee Supreme Court Board of Law Examiners, and a past President of the Nashville Bar Association, with over three decades of litigation experience, including civil rights work in the Nashville area. He avers that attorneys Herzfeld, Briley, and Frogge have excellent reputations and that the rates they each seek are at least commensurate with the rates of attorneys of similar ability, skill, and reputation. He avers that the rates sought actually reflect a discount from the market rates that they could have demanded. Mothershead, likewise, is complimentary of plaintiffs' counsel: "I am astonished the Plaintiffs' attorneys were able to produce such high-quality work product given the hours expended." (Docket No. 109 at p. 3.)

---

[7] Her firm also seeks $125 per hour for time spent by Law Clerks, but the billing records do not reflect any work performed by a Law Clerk through November 17, 2011.

The court finds that all of the attorney rates sought are reasonable. The court also finds that the paralegal rate sought by Ms. Herzfeld's firm ($105 per hour) is reasonable.

2. Reasonableness of Time Expended

The defendants raise two types of challenges to the reasonableness of the time charges.

First, the defendants contend that all three attorneys seek recovery for time spent on issues other than the official capacity claims, such as the class action claims, the money damages claims, and separate criminal proceedings concerning certain protesters. Specifically, they argue that 24.65 of Mr. Briley's 55.65 hours, 12.8 of Mr. Frogge's 38 hours, and 6.1 of Ms. Herzfeld's 42.1 hours through November 17, 2011 should be disallowed on this basis. The court agrees with the defendants that most of these hours should be disallowed because they either explicitly relate to non-compensable issues or, in some instances, because the plaintiffs have not demonstrated that the charges are sufficiently related to the official capacity claims to justify fee-shifting. For example, with respect to Mr. Briley, multiple entries reference work concerning "abstention" and "criminal matters," neither of which concern the official capacity claims. Of the hours challenged on this basis, the court will allow only 3 of the 24.65 hours challenged relative to Mr. Briley (*i.e.*, excluding 21.65 hours), only 3.2 of the 12.8 hours challenged relative to Mr. Frogge (*i.e.*, excluding 9.6 hours),[8] and none of the 6.1 hours challenged relative to Ms. Herzfeld.

---

[8] With respect to the entry for 1.5 hours concerning phone calls from protesters and the arguments to the Night Court judge, the court finds that the entry is reasonably related to the official capacity claims because the unlawful arrest and detention of the protesters was the necessary predicate for this lawsuit. The court also finds that at least 1.7 additional challenged hours were reasonably related to the official capacity claims.

Second, the defendants argue that it was unreasonable for all three attorneys to have billed significant hours on October 29 and 30, 2011 (totaling 21 hours by Briley, 20.5 hours by Frogge, and 8 hours by Herzfeld). The defendants argue that the work performed by these three attorneys on those days was redundant and unnecessary. Although the billing on these dates does reflect joint efforts by all three attorneys, sometimes on similar tasks, the efforts were made under the inordinate press of working together during the two weekend days preceding the filing of the Verified Complaint on Monday, October 31, 2011. Law enforcement officials had just arrested scores of protesters on two successive nights, and it is not surprising that it took some time to (1) interview the potential plaintiffs and witnesses, (2) identify and research the various legal issues, including sensitive First Amendment and Due Process claims, (3) draft a detailed, sworn Verified Complaint that included a robust description of the background facts and that asserted state and federal claims against multiple defendants, and (4) draft a Motion for Temporary Restraining Order with supporting legal arguments. Under the circumstances, it is understandable that it took a "team effort" to accomplish these and other tasks in a short time frame. The court therefore finds these challenged hours to be reasonable.

In sum, the court finds that Mr. Briley reasonably expended 34 hours (55.65 hours sought, less 21.65 disallowed hours), Mr. Frogge reasonably expended 28.4 hours (38 hours sought, less 9.6 disallowed hours), and Ms. Herzfeld reasonably expended 36 hours (42.1 hours sought, less 6.1 disallowed hours) on the official capacity claims through November 17, 2011. The defendants do not challenge the 5.0 hour time entry for paralegal services performed by Ms. Herzfeld's firm. The court finds the time spent on the listed tasks performed on October 30, 2011 (drafting declarations and speaking with the plaintiffs) to be reasonable.

Thus, the individual lodestar amounts are as follows:

- Mr. Briley: 34 hours X $395 per hour = $13,430

- Mr. Frogge: 28.4 hours X $300 per hour = $8,520

- Ms. Herzfeld: 36.0 hours X $350 per hour = $12,600, plus 5.0 paralegal hours X $105 per hour = $525.

In sum, the total lodestar amount is $35,075.

### C. *Johnson* Factors

The plaintiffs argue that the court should depart upward from the lodestar because of the undesirability of the case. To justify an enhancement, the plaintiffs must present "specific evidence" supporting an upward departure. The plaintiffs have not pointed to any specific evidence showing that an enhancement is warranted. Indeed, in response to this argument, the defendants have produced news clippings in which the plaintiffs' attorneys made statements to the media following the arrests, and there is no indication that the plaintiffs had difficulty attracting capable attorneys who, in the eyes of many, were heroes.

For their part, the defendants argue that a downward departure from the lodestar is warranted because the plaintiffs had only limited success. The court has already limited the scope of the award only to expenses related to the official capacity claims through November 17, 2011. Therefore, no further adjustment to account for the "scope of success" is necessary or warranted.

### III. <u>Expenses</u>

The plaintiffs appear to seek to recover $190 for a court reporter in the state criminal proceeding. That charge is not related to the official capacity claims and will be disallowed. The plaintiffs have not requested any other expenses.

### <u>CONCLUSION</u>

For the reasons stated herein, the plaintiffs' Motion for Fees will be granted in part and denied in part.  Under § 1988, the court will award the plaintiffs fees of $35,075 relative to the official capacity claims.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge